The UNITED STATES of
America, Plaintiff,

v.

BERKS COUNTY, PENNSYLVANIA; Berks County Commission; Berks County Board of Elections; Timothy Reiver; Mark Scott; Judith Schwank, in their official capacities as members of the Board of Elections; Kurt Bellman, in his official capacity as Director of Elections, Defendants.

Civil Action No. 03–1030.

United States District Court,
E.D. Pennsylvania.

March 18, 2003.

Amy H. Nemko, Joseph D. Rich, Ralph F. Boyd, Jr., United States Department of Justice, Washington, DC, Patrick L. Meehan, United States Attorney Office, Philadelphia, PA, for Plaintiff.

Gregory M. Harvey, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Defendants.

## MEMORANDUM

BAYLSON, District Judge.

### I. *Introduction*

This action arises from the election practices and procedures of Berks County, Pennsylvania, that plaintiff the United States of America ("Plaintiff" or "the Government") alleges violate the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 *et seq.,* and the guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution. For the reasons that follow, Plaintiff's Motion for Preliminary Injunction will be granted.

Expansion of the right to vote has been steady: today it often falls upon the courts to enforce the will of Congress. As Alexis de Tocqueville perceptively wrote in the 1830s, when the right to vote was highly restricted:

> There is no more invariable rule in the history of society: the further electoral rights are extended, the greater is the need of extending them; for after each concession the strength of the democracy increases, and its demands increase with its strength.

1 ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 59 (1835).

At the heart of this case is Section 4(e) of the Voting Rights Act of 1965, 42 U.S.C. § 1973b(e), an act of Congress which mandates protection of the voting rights of non-English speaking United States citizens. A substantial portion of the citizens of Berks County, particularly the City of Reading, were born in Puerto Rico and educated in Spanish-speaking schools. Anyone born in Puerto Rico is automatically a United States citizen, and has unrestricted migration rights within the entire United States. Congress mandated protection of their right to vote in a language other than English if they are illiterate in English.

Although there have been three prior judicial decisions enforcing this law in cases brought by private parties, the United States acknowledges that this is the first case it has filed under Section 4(e). However, that fact is legally irrelevant. This Court has the obligation to follow Congress' mandates if the facts warrant granting the relief which the Government seeks.

Voting without understanding the ballot is like attending a concert without being able to hear. Even if the voter, illiterate in English, may be able to distinguish one candidate's last name from another, the voter illiterate in English may not understand the office for which the various candidates are running, and surely cannot understand the various propositions, ranging from bond authorizations to constitutional amendments. But the meaningful right to vote extends beyond the immediate four corners of the voting machine. Advertisements of the location of polling places and sample official ballots are meaningless if a large segment of the voters in a particular precinct cannot read the material. Voting officials who cannot communicate with Spanish-speaking voters cannot discharge their duties. The voters themselves may have difficulty establishing their right to vote and to exercise their right to special assistance at the polling place under Section 208 of the Voting Rights Act, 42 U.S.C. § 1973aa–6.

## II. *Background*

On February 25, 2003, the Government filed a Complaint seeking declaratory and injunctive relief against defendants Berks County, Pennsylvania; Berks County Commission; Berks County Board of Elections; Timothy Reiver; Mark Scott; Judith Schwank, in their official capacities as members of the Board of Elections; and Kurt Bellman, in his official capacity as Director of Elections (collectively "Defendants"). The filing of the Complaint was prompted by a two-year investigation conducted by the Department of Justice ("Department") during which Department employees monitored elections in Berks County. Based on this investigation, the Government found evidence of hostile and unequal treatment of Hispanic and Spanish-speaking voters by poll workers in the City of Reading.

The United States filed its Motion for Preliminary Injunction on March 10, 2003, and Defendants filed a verified response on March 11, 2003. The Court held a hearing on March 13, 2003 and has expedited the issuance of this Memorandum and Order so as to give the parties as much time as possible to prepare for the May 20, 2003 primary election. Counsel are to be commended for their diligence and cooperation in this process.

Defendants, who conduct elections in the City of Reading, have a municipal primary election scheduled for May 20, 2003, and the Government alleges that Defendants will continue to violate federal law unless enjoined by the Court. The Government requests that the Court preliminarily enjoin Defendants from conducting further elections in a manner that violates the Voting Rights Act until the Court issues a final determination and order.

The following facts are taken from exhibits entered into evidence by the Government without objection by Defendants for the purposes of this Motion, a Joint Stipulation of Facts, and the facts stated in Defendants' verified response.

### A. *Hispanic Population and Language Ability*

In the last ten years, the Hispanic population in Berks County has more than

doubled.[1] The vast majority of Hispanic citizens reside within the city limits of Reading. (Tables QT–PL (Reading City, PA), QT–PL (Berks Co., PA) (U.S. Census 2000), Pl.'s Mot. Prelim. Inj., Exs. 1–2). Reading's Hispanic population in 2000 was 30,302 persons, constituting 37.3 percent of the total population. *Id.* Ex. 1. The majority of the Hispanic population, 63 percent, or 19,054 persons, are United States citizens of Puerto Rican descent. (Table PCT011005 (Reading City, PA) (U.S. Census 2000), Pl.'s Mot. Prelim. Inj., Ex. 3).

The 2000 Census also indicates that about half of Reading's Puerto Rican population is first generation, born in Puerto Rico. (Table PCT63H (Reading City, PA) (U.S. Census 2000), Pl.'s Mot. Prelim. Inj., Ex. 4). Many of these persons were educated in Puerto Rico, where the primary language of classroom instruction is Spanish. The Puerto Rico Department of Education has promulgated regulations that specify that the language of classroom instruction will be Spanish, the vernacular language of the Commonwealth of Puerto Rico. (Dept. of Educ. of Puerto Rico, General Regulations of Students, Art. III, § 3.2, Pl.'s Mot. Prelim. Inj., Ex. 5).

Almost one-third of Reading's Hispanic citizens do not speak English sufficiently well to participate in the electoral process. The 2000 Census indicates that 23,214 Reading residents over age five speak Spanish at home, and of those, 10,929 speak English "less than very well." (Table DP–2 (Reading City, PA) (U.S. Census 2000), Pl.'s Mot. Prelim. Inj., Ex. 6). This limited-English proficient group con-stitutes nearly 15 percent of the total Reading population of persons over age five. *Id.*

The Government has analyzed registered voter lists for persons with Spanish surnames for the year 2001 for precincts in the City of Reading. Based on this analysis, the Government has determined that 45 of 48 polling places in Reading contain more than five percent Hispanic registered voters. (Joint Stipulation of Facts ¶ 21). In addition, 18 polling places contain at least 30 percent Hispanic registered voters, and 12 contain over 40 percent Hispanic registered voters. *Id.*

Finally, substantial evidence exists to demonstrate that Hispanics in Reading suffer from significant socioeconomic inequality, which is ordinarily linked to lower literacy rates, unequal educational opportunities, and depressed participation in the political process. In 1999 dollars, Hispanics in Reading had a per capita income of only $8,077; less than half the per capita income of whites, who earned $17,317. (Tables PL157H, PL157I (U.S. Census 2000), Pl.'s Mot. Prelim. Inj., Exs. 7–8). According to the 2000 Census, a very high level, 40.6 percent, of Reading's Hispanic citizens live below the poverty line, compared to 13.9 percent of whites. (Table PL159H, PL159I (U.S. Census 2000), Pl.'s Mot. Prelim. Inj., Exs. 9–10). With regard to education, the Census indicates that 58 percent of Hispanics in Reading age 25 or older have not graduated from high school, while only 29 percent of whites have failed to achieve this level of education. (Table PL148H, PL148I (U.S. Census 2000), Pl.'s

---

1. The parties have stipulated that Berks County does not meet the requirements of Section 203 of the Voting Rights Act, 42 U.S.C. § 1973aa–1a. (Joint Stipulation of Facts ¶ 49). Under Section 203, any state or political subdivision in which U.S. Census data shows more than five percent of its eligi-ble voting population belongs to a single language minority and in which the illiteracy rate exceeds the national average, must provide all voting notices, forms, instructions, assistance, or other materials and ballots in the applicable minority language.

Mot. Prelim. Inj., Exs. 11–12). Finally, the Census indicates that Hispanics in Reading suffer unemployment at twice the rate of whites (7.8 percent compared to 3.4 percent). (Table PL150H, PL150I (U.S. Census 2000), Pl.'s Mot. Prelim. Inj., Exs. 13–14).

## B. Berks County Election Practices

### 1. Hostile and Disparate Treatment of Hispanic and Spanish–Speaking Voters

In the course of monitoring elections in Berks County over the past two years, the Government found substantial evidence of hostile and unequal treatment of Hispanic and Spanish-speaking voters by poll workers in Reading. Poll workers turned away Hispanic voters because they could not understand their names, or refused to "deal" with Hispanic surnames. (Lee Decl. ¶¶ 9–10; Negron Decl. ¶¶ 10–11, 14–15, Pl.'s Mot. Prelim. Inj., Exs. 15–16). Poll workers made hostile statements about Hispanic voters attempting to exercise their right to vote in the presence of other voters, such as "This is the U.S.A.-Hispanics should not be allowed to have two last names. They should learn to speak the language and we should make them take only one last name." (Lee Decl. ¶ 9, Pl.'s Mot. Prelim. Inj., Ex. 15); and "They can't speak, they can't read, and they come in to vote." (Elkin Decl. ¶ 10, Pl.'s Mot. Prelim. Inj., Ex. 17). Poll workers made discriminatory statements concerning Hispanics to Department personnel monitoring the polls, such as "No Hispanics wake up before 9:30 a.m." and so would not come to the polling place until later in the day. (Caro–Lopez Decl. ¶ 9, Pl.'s Mot. Prelim. Inj., Ex. 18).

Poll workers placed burdens on Hispanic voters that are not imposed on white voters. They demanded photo identification from Hispanic voters, even though that is not required under Pennsylvania law. (Rodriguez Decl. ¶ 10; Luna Decl. ¶ 9, Pl.'s Mot. Prelim. Inj., Exs. 19–20). Poll workers required only Hispanic voters to verify their addresses and told Department staff they did so because Hispanics "move a lot within the housing project." (Lee Decl. ¶ 11, Pl.'s Mot. Prelim. Inj., Ex. 15).

Hispanic voters have stated that this hostile attitude and rude treatment makes them uncomfortable and intimidated in the polling place, and discourages them from voting. (Martinez Decl. ¶ 11, Pl.'s Mot. Prelim. Inj., Ex. 21). The aforementioned declarants are a representative sample of Hispanic citizens in Reading who have endured similar treatment.[2]

### 2. Lack of Bilingual Poll Workers

Despite knowledge of the large community of Hispanic citizens and limited-English proficient voters, Defendants do not recruit, appoint, train, or maintain a pool of Hispanic poll workers or poll workers with Spanish-language skills.[3] (Joint Stip-

---

**2.** The Government claims that it is aware of many people who have been treated in a hostile manner, based on its ongoing investigation and newspaper accounts. *See, e.g.,* Merav Bushlin, *Beyond the Ballot Battle: Latino Voters Complain of Discrimination at Berks Polls,* READING EAGLE, Jan. 5, 2003, at A1. (Pl.'s Mot. Prelim. Inj., Ex. 22). The Government asserts that it will be prepared after discovery to present additional evidence concerning Hispanic voters who have experienced hostile treatment at the polls and the adverse effect this treatment had on their right to vote.

**3.** Although the Election Judge, Majority Inspector, and Minority Inspector are elected positions under Pennsylvania law, Defendant Berks County Board of Elections has the authority to appoint clerks and machine operators, and to fill vacancies if the elected posi-

ulation of Facts ¶ 32). To determine the percentage of Hispanic poll workers, the Government analyzed Berks County's poll worker lists for persons with Spanish surnames for the years 1998 through 2001 for precincts in the City of Reading. Based on this analysis, the Government has determined that an extremely low number of Spanish-surnamed poll workers serve at Reading polling places. In November 1998, six out of 226 total poll workers, or 2.7 percent, had Spanish surnames; in November 1999, three out of 226 total poll workers, or 1.3 percent, were Spanish-surnamed; in November 2000, nine out of 233 poll workers, or 4.3 percent, had Spanish surnames; in May 2001, 10 out of 237 poll workers, or 4.2 percent, were Spanish-surnamed. (Joint Stipulation of Facts ¶¶ 22–25). This averages to approximately three percent of poll workers in Reading precincts with Spanish surnames, compared to a voting-age population that is over 30 percent Hispanic. *Id.* ¶ 8. The lack of bilingual ability has led some poll workers to recognize that they cannot effectively communicate with limited-English proficient voters. (Martinez Decl. ¶ 9, Pl.'s Mot. Prelim. Inj., Ex. 21).

### 3. *Lack of Bilingual Materials*

Defendants provide bilingual voter registration forms; 395 of the 407 voting machines used in Reading have some bilingual instructions on machine operation inside the voting machines. (Joint Stipulation of Facts ¶¶ 26–27). Otherwise, Defendants refuse to provide bilingual written election-related materials, including the ballot. The following are all printed exclusively in English: signs inside and outside the polling places and voting booths; sample ballots posted inside the polling places; posters instructing voters how to use the electronic voting machines

before voting; the text of referenda and charter amendments on the ballot posted in the polling places for voters to view before voting; · the elector's affidavit where challenged voters affirm their eligibility to vote; and the declaration of assistance, where voters declare that they need assistance in marking their ballots or operating the voting machines. (Pl.'s Mot. Prelim. Inj., Exs. 23–28).

The impact of the lack of bilingual materials and poll workers on limited-English proficient voters is severe. Many limited-English proficient voters are unable to read these English-only materials. When a voter who was born in Puerto Rico and who speaks little English entered the voting booth on November 5, 2002, she was unable to read the English-language ballot, and simply "pushed all kinds of buttons" on the machine, and in the end was "not sure who [she] voted for." (Rodriguez Decl. ¶ 14, Pl.'s Mot. Prelim. Inj., Ex. 19).

### 4. *Denial of Assistor of Choice*

Due to the lack of bilingual materials and assistance available at the polling places, many voters attempt to bring bilingual friends or family members to the polling places to assist them. *Id.* ¶ 8; Pazmino Decl. ¶ 11; Maldonado Decl. ¶¶ 9–11; Luna Decl. ¶¶ 10–11, Pl.'s Mot. Prelim. Inj., Exs. 19, 29–30, 20. However, in certain instances, poll workers have not permitted voters to bring their assistors of choice with them. (Rodriguez Decl. ¶ 13; Maldonado Decl. ¶ 11; Luna Decl. ¶ 12, Pl.'s Mot. Prelim. Inj., Exs. 19, 30, 20). One voter had accompanied to the polling place her elderly mother, who was born in Puerto Rico and speaks little English, and attempted to enter the voting booth to assist her, but was told by a poll worker

tions are not filled. 25 Pa. Cons.Stat. Ann. §§ 2674–2675.

that she could not enter the booth. (Luna Decl. ¶ 12, Pl.'s Mot. Prelim. Inj., Ex. 20).

Another voter attempted to assist his brother, who had recently moved to Reading from Puerto Rico, and who did not speak much English, when poll workers told him that he could not assist. (Maldonado Decl. ¶ 11, Pl.'s Mot. Prelim. Inj., Ex. 30). The man repeatedly asked his brother in Spanish what to do, and was upset when his English-speaking brother was not allowed to help him. *Id.* ¶ 12.

Luis Pazmino is the president of the Reading Housing Authority Resident Council at the Oakbrook Housing Project, and in that capacity, he often drives residents to the polls on election day and helps those who are limited-English proficient once inside. (Pazmino Decl. ¶ 7, Pl.'s Mot. Prelim. Inj., Ex. 29). On November 5, 2002, he attempted to translate for some of his residents, and was physically pushed by the election judge who told him, "You're not supposed to be here." *Id.* ¶¶ 8, 13.

### 5. *County Officials' Knowledge and Refusal to Remedy*

The Government has brought various examples of the above facts, and others, to the attention of Defendants several times over the course of its ongoing two-year investigation. Department staff members monitored four elections: May 15, 2001; November 6, 2001; May 21, 2002; and November 5, 2002. After monitoring these elections, Department attorneys contacted the named Defendants before and after each election to inform them of the election practices and procedures that raised their concerns. (Letter to Defs. on October 22, 2001, Pl.'s Mot. Prelim. Inj., Ex. 31).

The Government also is aware that Reading residents have communicated similar concerns to Defendants as early as 1999. (Zayas Decl., Pl.'s Mot. Prelim. Inj., Ex. 32). Numerous articles have appeared in local newspapers outlining Hispanic residents' concerns about equal treatment at the polls.[4] Hispanic residents also have raised concerns in county council meetings.

### III. *Legal Standard and Jurisdiction*

 In ruling on a motion for a preliminary injunction, the Court must consider the following four factors: (1) the likelihood that the moving party will prevail on the merits; (2) the extent to which the moving party is irreparably harmed; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994), *cert. denied,* 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995). Issuing a preliminary injunction is an " 'extraordinary remedy' and should be restricted to 'limited circumstances.' " *Moscony v. Quaker Farms, LP*, No. CIV.A.00–2285, 2000 WL 1801853, at *1 (E.D.Pa. Dec.8, 2000) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.1989)). A district court should endeavor to balance these four factors to determine whether an injunction should issue. *See BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir.2000). All four factors must weigh in favor of granting the preliminary injunction. *See Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 803 (3d Cir.1998). The moving party clearly bears

4. *See, e.g.,* Dan Kelly, *Berks to Fight Order to Help Latino Voters*, Reading Eagle, Dec. 20, 2002, at A1; George Strawley, *Berks County to Devise Spanish-language Ballot*, Patriot-News, Oct. 14, 2001. (Pl.'s Mot. Prelim. Inj., Exs. 33–34).

the burden to prove that all elements required for a preliminary injunction are met. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 486 (3d Cir.2000).

The Court has jurisdiction pursuant to 28 U.S.C. § 1345, as this action was commenced by the United States, and pursuant to 42 U.S.C. § 1973j(f) as the action concerns an alleged deprivation or attempted deprivation of secured rights. Venue is appropriate under 28 U.S.C. § 1391.

## IV. *Summary of Issues*

### A. *Government's Arguments*

The Government has brought claims under Sections 4(e), 208, and 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973b(e), 1973aa–6, and 1973. The Berks County election practices and procedures, discussed in Part II.B, *supra,* form the factual basis for these alleged violations.

#### 1. *Section 4(e)*

Section 4(e) of the Voting Rights Act, 42 U.S.C. § 1973b(e), states:

(1) Congress hereby declares that to secure the rights under the fourteenth amendment of persons educated in American-flag schools in which the predominant classroom language was other than English, it is necessary to prohibit the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language.

(2) No person who demonstrates that he has successfully completed the sixth primary grade[5] in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language, except that in States in which State law provides that a different level of education is presumptive of literacy, he shall demonstrate that he has successfully completed an equivalent level of education in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English.

The Government alleges that Defendants knowingly conduct English-only elections and fail to provide limited-English proficient United States citizens of Puerto Rican descent with election information and assistance necessary for their effective participation in the electoral process. (Pl.'s Compl. ¶ 27). The Government asserts that Defendants' conduct violates Section 4(e) by conditioning the right to vote of United States citizens educated in American-flag schools in Puerto Rico, where Spanish is the predominant language, on such persons' ability to read, write, understand, or interpret any matter in English, and unless enjoined, such conduct will continue. *Id.* ¶¶ 27–28.

#### 2. *Section 208*

Section 208 of the Voting Rights Act, 42 U.S.C. § 1973aa–6, states:

---

5. In 1970, Congress amended the Voting Rights Act to prohibit all states from using any literacy tests for a period of five years. 42 U.S.C. § 1973a(a). The 1970 provision was upheld in *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). As a result of the 1970 amendment, the sixth-grade education requirement in Section 4(e) was eliminated.

Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

The Government claims that Defendants have violated Section 208 by failing to ensure that voters who are unable to read the ballot receive voting assistance at the polling place from assistors of their choice, and unless enjoined, such conduct will continue. (Pl.'s Compl. ¶¶ 23–24).

### 3. *Section 2*

Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, states:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That

nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Finally, the Government contends that Defendants' election policies and practices violate Section 2 because the "totality of the circumstances" of Defendants' actions has denied limited-English proficient Hispanic voters the opportunity to participate effectively in the electoral process on an equal basis with other members of the electorate, and unless enjoined, such conduct will continue. (Pl.'s Compl. ¶¶ 19–20).

### B. *Defendants' Arguments*

Defendants assert that the Government fails to establish a probability that it will prevail on the merits under any section of the Voting Rights Act.

### 1. *Section 4(e)*

Defendants argue that the principal cases upon which the Government relies for its Section 4(e) claims, discussed in Part V.A.1, *infra,* are overreaching and distinguishable from the instant case. (Defs.' Mem. Resp. Pl.'s Mot. Prelim. Inj. at 14). They assert that "there is no contested judicial decision in which a court has granted the sweeping relief sought by the Government in this case." *Id.* at 13–14.

### 2. *Section 208*

Defendants assert that they are fully compliant with Section 208 because they gave forms for assistance and instructions to all polling place officers at the November 5, 2002 election, including an official form called "Declaration of Assistance" that stated:

Any elector who is entitled to receive assistance in voting shall be permitted by the judge of election to select a per-

# 534

son of the elector's choice to enter the voting compartment or voting machine booth with him/her to assist him/her in voting. Exceptions are that the elector's employer or an agent of the employer or an officer or agent of the elector's union shall not be eligible to assist the elector.

(Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. at 11).

Defendants assert that poll officials were also given a form called "Important Changes for this Election" that stated:

1. Declaration of Assistance can be taken at polls for electors requiring assistance and does not have "ATV" marked on the Poll Book, assistance may be provided by anyone at the elector's choosing expect [sic] the elector's employer or an agent of the employer or an officer or agent of the elector's union, or a candidate. Assistant NEED NOT be from the same voting precinct, but assistant's name must be recorded on list provided.

*Id.* at 12 (emphasis in original).

Defendants also assert that they provided a form for declaration of assistance to be used if the "elector does not have anything marked in the disability column of the voter book" and which explicitly re-

ferred to the "nature of disability, including illiteracy" to be declared at the polling place, and that the form included the same definition under federal law of persons able to render assistance. *Id.* All of these forms were printed exclusively in English. (Joint Stipulation of Facts ¶ 26).

### 3. *Section 2*

Defendants contend that they have not violated Section 2 because Hispanic citizens, including limited-English proficient Hispanic citizens, have participated in the political process and have cast votes "that have elected representatives of their choice."[6] (Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. at 4). They assert that they have "already provided Spanish-language instructions at the two most important parts of the election process—voter registration and voting machine balloting." *Id.* at 5. Of the 407 voting machines used in Berks County, 395, including all of the voting machines designated for polling places in Reading, have instructions in English and Spanish pertaining only to machine operation inside the voting machine. (Joint Stipulation of Facts ¶ 26; Defs.' Ex. 1). Voter registration forms are available from the County Elections Services office upon request in either English or Spanish. (Joint Stipulation of Facts ¶ 27). Addition-

---

**6.** Defendants list the following Hispanic citizens of Reading elected to various positions in recent years:

(i) Angel F. Figueroa, of Puerto Rican descent, nominated in a contested primary election and elected in a contested November election to Reading City Council, 1st District, in 2001;
(ii) Alicia Montoya, nominated by both major parties and elected to the Reading School Board, at large (Citywide) in 2001;
(iii) Nytza Santiago, an incumbent member of the Reading School Board by appointment by that Board to fill a vacancy, and previously elected to one term of the Reading School Board at a prior election;

(iv) Aixa Hernandez elected as Judge of Election for Reading Precinct 3–1 (Third Ward, First Precinct) in November 2001;
(v) Ruth D. Herrera elected as Majority Inspector for Reading Precinct 1–1 (First Ward, First Precinct) in November 2001;
(vi) José A. Diaz elected as PA State Constable for Reading First Ward in November 1997;
(vii) Adalberto Rivera elected as PA State Constable for Reading Fifth Ward in November 1997;
(viii) Andres Ortiz elected as PA State Constable for Reading Sixth Ward in November 1997
(Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. at 4–5).

ally, Defendants point out that they have accepted a computerized voter registration system ("SURE") that will generate correspondence and notices to voters in English and Spanish. (Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. at 6). Defendants expect the SURE system, which they have not yet implemented, to be operational by September 2003 and to run parallel to the existing system for the November 2003 election. (Joint Stipulation of Facts ¶ 27).

Defendants further claim that the Government has provided "equivocal" evidence that Hispanic voters with limited English proficiency have been turned away and not allowed to cast a ballot. (Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. at 10).

## V. *Plaintiff Has Satisfied the Requirements for a Preliminary Injunction*

The Court, relying on the relevant statutes, case law, the parties' briefs, and the evidence introduced at the evidentiary hearing, finds that the Government has met its burden for the issuance of a preliminary injunction.

### A. *Likelihood of Success on the Merits*

#### 1. *Section 4(e)*

Federal courts, including this Court, have broadly interpreted Section 4(e) to prohibit both the explicit conditioning of the right to vote on the ability to speak English and the conduct of English-only elections. *See Arroyo v. Tucker,* 372 F.Supp. 764, 766 (E.D.Pa.1974) (Lord, C.J.); *Torres v. Sachs,* 381 F.Supp. 309 (S.D.N.Y.1974) (Stewart, J.); *PROPA v. Kusper,* 350 F.Supp. 606 (N.D.Ill.1972), *aff'd,* 490 F.2d 575 (7th Cir.1973). *See also Katzenbach v. Morgan,* 384 U.S. 641, 645, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (upholding constitutionality of Section 4(e)).

Since 1917, persons born in Puerto Rico have been citizens of the United States *ipso jure. Arroyo,* 372 F.Supp. at 766 (citing 8 U.S.C. § 1402). As United States citizens, Puerto Ricans are entitled to unrestricted migration to the mainland states. *Id.* Although Puerto Rico maintains both English and Spanish as official languages, Spanish is the primary language spoken by Puerto Ricans and used in American-flag schools in Puerto Rico. (Dept. of Educ. of Puerto Rico, General Regulations of Students, Art. III, § 3.2, Pl.'s Mot. Prelim. Inj., Ex. 5). Unlike naturalized citizens, who must demonstrate a facility with English to gain citizenship, Puerto Ricans residing in the United States need not speak or read English to exercise the full benefits of citizenship. *PROPA,* 350 F.Supp. at 609. As a result, "thousands of Puerto Ricans have come to live in New York, Chicago, and other urban areas; they are eligible, as residents and U.S. citizens, to vote in elections conducted in a language many of them do not understand." *PROPA,* 490 F.2d at 578.

This case is similar to *Arroyo,* which was brought by private plaintiffs in Philadelphia nearly 30 years. In *Arroyo,* two Puerto Rican citizens, on behalf of the class of Puerto Rican citizens living in Philadelphia, brought a Section 4(e) action to compel Philadelphia County Commissioners to prepare all written election materials in English and Spanish, and to provide bilingual personnel at all polling places falling within a 1970 Census tract containing five percent or more persons of Puerto Rican birth or parentage. 372 F.Supp. at 765.

The Court granted preliminary injunctive relief and issued an order on October 12, 1973, eight days after the complaint was filed, "to insure that Puerto Rican voters will be able to fully and effectively

participate in the forthcoming November 6, 1973 elections in the City of Philadelphia." *Arroyo v. Tucker*, No. 73–2247 (E.D.Pa. Oct.12, 1973) (order granting preliminary injunction) (Pl.'s Mot. Prelim. Inj., Ex. 36). The order required the city defendants to provide Spanish translations of election materials at every polling place in the City of Philadelphia; to staff bilingual personnel at all polling places in Philadelphia Census tracts containing five percent or more persons of Puerto Rican birth or parentage; and to affix Spanish translations of all propositions, amendments, and retention of judges appearing on the ballot in each voting booth in all election districts in Philadelphia containing one or more residents of Puerto Rican birth or parentage. *Id.*

The Court later granted the plaintiffs' motion for summary judgment based on the following facts, all of which are present in the instant case: the plaintiffs were United States citizens of Puerto Rican birth residing in the City of Philadelphia; such citizens were eligible to vote but did not read, write, or comprehend English; English was the sole language in which Philadelphia conducted its election process; and the plaintiffs' affidavits demonstrated that they were unable to participate in the electoral process unless they received assistance in Spanish. *Arroyo*, 372 F.Supp. at 767–68.

Chief Judge Lord found that:

[T]he 'right to vote' means more than the mechanics of marking a ballot or pulling a lever. Here, plaintiffs cannot cast an 'informed' or 'effective' vote without demonstrating an ability to comprehend the registration and election forms and the ballot itself. The English-only election materials therefore constitute a device 'conditioning the right to vote' of plaintiffs on their ability to 'read, write, understand, or interpret any matter in the English language.' Such an election process cannot withstand scrutiny under the Voting Rights Act.

*Id.* at 767 (footnote omitted).

*Arroyo* followed several other decisions with similar facts. In *Torres*, limited-English proficient Puerto Rican citizens living in New York City brought a class action pursuant to Section 4(e) challenging the defendants' English-only elections. 381 F.Supp. at 311. The United States District Court for the Southern District of New York entered a preliminary injunction on September 6, 1973 concerning the November 6, 1973 election, by which the city defendant was ordered to conduct all elections on bilingual ballots and seek to provide bilingual poll workers for all election precincts having at least five percent Spanish-speaking voters. *Id.* Judge Stewart later granted summary judgment for the plaintiffs, finding "New York City's past English-only election system constitutes a condition on the plaintiffs' right to vote based on their ability to 'read, write, understand, or interpret any matter in the English language' as presently proscribed by Section 4(e) and the 1970 Voting Rights Amendment." *Id.* at 312.

In *PROPA*, the plaintiffs were four limited-English proficient United States citizens who were educated in Puerto Rico, resided in Chicago, and who were registered and entitled to vote. 350 F.Supp. at 608. The defendant, the City of Chicago, was planning to conduct an English-only election for the November 7, 1972 general election. *Id.* After the class action complaint was filed, the defendants announced that certain election materials would be printed in Spanish, and that bilingual election judges would be assigned where needed, but that these actions were voluntary rather than obligatory under federal law. *Id.* The United States District Court for

the Northern District of Illinois granted the plaintiffs' motion for a preliminary injunction, finding that Section 4(e) required that persons in the plaintiffs' class be permitted to vote, and that "[i]f voting instructions and ballots or ballot labels are printed only in English, the ability of the citizen who understands only Spanish to vote effectively is seriously impaired." *Id.* at 610. The Seventh Circuit affirmed the district court's decision, noting that a "Spanish-speaking Puerto Rican is entitled to assistance in the language he can read or understand." 490 F.2d at 575.

Defendants argue that the above cases all can be distinguished from the instant case. They claim *Arroyo* is distinguishable because in that case the Philadelphia Board of Elections failed to file an answer to the plaintiff's complaint or submit any papers in opposition to the private plaintiffs' motions for a preliminary injunction and class certification. (Defs.' Mem. Opp. Pl.s' Mot. Prelim. Inj. at 14).

Defendants assert that the decision in *Torres,* like *Arroyo,* resulted from an acquiescent Board of Elections that had earlier resolved to provide bilingual ballots and Spanish-speaking inspectors in election districts having at least five percent Spanish-speaking voters, and that the defendants only opposed summary judgment on the grounds that the relief sought was moot.[7] *Id.* at 14–15. Defendants also point out that *Arroyo* and *Torres* "were decided on percentage-of-voter grounds that Congress later adopted as Section 203 of the Voting Rights Act in 1975, but with criteria that both side[s] in the instant case

agree do not apply to Berks County." *Id.* at 15.

Defendants note that in *PROPA* the defendants in that case, during conferences, agreed to take actions sought by the plaintiffs to assist Spanish-speaking voters but refused to enter into a formal agreement to that effect, which led to the court's order requiring the defendants to honor their promises to the plaintiffs and the court. *Id.* Defendants note that the Seventh Circuit affirmed the lower court's decision but only required the defendants to use "reasonable efforts" concerning the appointment of judges of election. *Id.*

The Court rejects Defendants' efforts to distinguish these three cases. All three, despite some procedural anomalies, speak with a united and consistent voice in upholding and enforcing the provisions of Section 4(e). The Court considers them as persuasive a precedent for finding that the Government will likely succeed on the merits of its claim.

Defendants suggest that granting injunctive relief to the Government would be an expansive interpretation of Section 4(e) and could lead to the eventual result that bilingual ballots and voting materials be provided in every voting precinct in the country with even a single limited-English proficient voter of Puerto Rican descent, educated in Spanish in an American-flag school in Puerto Rico. However, that argument is belied by the fact that the Government only seeks injunctive relief in 45 of the 48 voting precincts in Reading where five percent or more of the registered voters are Hispanic. Although it is unlike-

---

**7.** Judge Stewart noted:

> The fact that the defendants have resolved to take some steps in the direction of giving Spanish-speaking citizens an effective vote is an inadequate assurance for such a fundamental right in a free society. It is also significant that the defendants took no step

> to provide election assistance in Spanish prior to this Court's orders ... and prior to the commencement of this action on September 12, 1973.

*Torres v. Sachs,* 381 F.Supp. 309, 312–13 (S.D.N.Y.1974).

ly that Defendants' envisioned scenario would occur, the Government does have wide discretion to bring test cases and enforce federal statutes in any jurisdiction it believes to be in violation of federal law. The instant action is not frivolous or *de minimus,* and the Court is guided by the plain language of Section 4(e). *See, e.g., United States v. Knox,* 32 F.3d 733, 744 (3d Cir.1994). The Court finds the statutory language to be clear, and therefore the words must be interpreted in accordance with their ordinary meaning. *See id.* As the Supreme Court has explained, when confronted with a statute which is unambiguous on its face, courts "ordinarily do not look to legislative history as a guide to its meaning." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 185 n. 29, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

■ The court finds it is likely that the Government will prevail on its claim that Defendants' use of an English-only election process violates Section 4(e) by conditioning the right to vote for Reading's sizeable Puerto Rican community, many of whom attended schools in Puerto Rico, on the ability to read, write, and understand English.

### 2. *Section 208*

The Government has presented evidence showing that Spanish-speaking voters in Reading who are unable or have limited ability to read or write English often bring a friend or family member with them to the polling place to assist them. In numerous instances, as discussed in Part II. B.4, *supra,* poll workers have told limited-English proficient voters that their friend or family member may not accompany them inside the voting booth. One limited-English proficient voter, who wanted her husband to assist her, was told by a poll worker that he could not help her because only one person was allowed in the booth, but the same poll worker did not stop four elderly white women from entering one voting booth together. (Rodriguez Decl. ¶¶ 12–13, Pl.'s Mot. Prelim. Inj., Ex. 19). When voters are denied the right to bring their assistor of choice into the voting booth, they feel uncomfortable with the process, do not understand the ballot, and cannot cast a meaningful vote.

Although the Court expressed some concern at the hearing about the use of Section 208 as a pretext for illegal assistance, the Court has no basis to assume that illegal assistance will take place, and must give deference to the provisions of Section 208. The elected polling officials must adhere to Section 208, but have discretion to prevent what would otherwise be illegal assistance.

■ The Government is likely to prevail on its claim that Defendants' conduct violates Section 208.

### 3. *Section 2*

Section 2 ensures that minority voters are free from any election practice "which operate[s], designedly or otherwise" to deny them the same opportunity to participate in all phases of the political process as citizens. S.Rep. No. 97–417, at 28 (1982, U.S.Code Cong. & Admin.News 1982, pp. 177, 205). The critical question in a Section 2 claim is "whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Thornburg v. Gingles,* 478 U.S. 30, 63, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

Congress extended the Voting Rights Act in 1975 to cover certain language minority groups, including persons of Spanish heritage. *See Hernandez v. Woodard,*

714 F.Supp. 963, 967 (N.D.Ill.1989) (citing 42 U.S.C. §§ 1973(c)(3), 1973aa–1a(e)). Upon "finding that voting discrimination against citizens of [such] minorities is pervasive and national [in] scope," Congress brought these groups within the protection of Section 2, which previously had applied only to racial minorities. *Id.* at 967 (citing 42 U.S.C. § 1973b(f)(1)). Federal courts have held that Section 2 claims may be brought to challenge election officials' failure to provide language assistance, *see Hernandez,* 714 F.Supp. at 967, as well as election officials' failure to appoint minority poll workers, *see Harris v. Graddick,* 593 F.Supp. 128, 133 (M.D.Ala.1984).[8]

The totality of the circumstances demonstrates that Hispanic and Spanish-speaking voters have less opportunity than other members of the electorate to participate in the electoral process. First, election officials have permitted poll workers to openly express hostility to Hispanic voters. Non–Hispanic poll workers boasted of the outright exclusion of Hispanic voters to Department staff during the May 15, 2001 primary election. (Lee Decl. ¶ 9, Pl.'s Mot. Prelim. Inj., Ex. 15). Poll workers made rude, hostile, and racist comments to Department staff in the presence of Hispanic and Spanish-speaking voters. (*Id.* ¶¶ 8–11; Caro–Lopez Decl. ¶ 9; Elkin Decl. ¶¶ 8–9, Pl.'s Mot. Prelim. Inj., Exs. 15, 18, 17). The adverse impact of such hostility may prevent equal access to the electoral process for all voters. *See Harris,* 593 F.Supp. at 131 n. 3 (finding support for Section 2 violation in substantial evidence of "recent pleasant encounters" between minority voters and non-minority poll workers and noting that the result of

such encounters may lead minority voters to "not venture to vote again.").

Hispanic voters have been treated differently and discriminated against at polling places. Poll workers have required Hispanic voters to prove their residency while non-Hispanic voters have not been required to do so. (Luna Decl. ¶ 9, Pl.'s Mot. Prelim. Inj., Ex. 20). Poll workers prevented Hispanic voters from bringing an assistor of their choice into the voting booth while permitting non-Hispanic voters to do so. (Rodriguez Decl. ¶¶ 12–13, Pl.'s Mot. Prelim. Inj., Ex. 19).

The lack of minority poll workers also is a serious impediment to Hispanic voters gaining equal access to the electoral process. In *Harris,* the United States District Court for the Middle District of Alabama found that there was gross underrepresentation of black persons among poll officials across the state of Alabama, and that such underrepresentation substantially "impede[d] and impair[ed] the access of black persons to the state political process" in violation of Section 2. 593 F.Supp. at 137. Based on the totality of the circumstances, the court held that the plaintiffs, black Alabama citizens, were likely to succeed on the merits of their Section 2 claim at trial and granted a preliminary injunction, ordering each of the defendant counties to appoint and assign black poll officials in numbers that reasonably corresponded to the percentage of black registered voters in that precinct. *Id.* at 138.

Hispanic residents in Reading are severely underrepresented as poll workers. Although Hispanics currently constitute

---

**8.** Although the parties have stipulated that Berks County is not subject to the requirements of Section 203, (Joint Stipulation of Facts ¶ 49), Section 2 applies nationwide, and wherever the totality of the circumstances indicates that a jurisdiction's political processes are not equally open to participation by minority voters because its minorities have less opportunity than other members of the electorate to participate in the political process, a violation of Section 2 has occurred.

37.3 percent of Reading's total population and 30.4 percent of the voting population, Hispanics, on average, constitute only 3.1 percent of poll workers hired from 1998 to 2001. (Joint Stipulation of Facts ¶¶ 7–8, 22–25).

Defendants argue that *Harris* can be distinguished from the instant case because in *Harris,* polling place officers all were appointed by a central authority, rather than elected by the voters in the precinct, as required in Berks County under Pennsylvania law. *See* 25 Pa. Cons. Stat. Ann. §§ 2674–2675. However, while three of the polling place officers are elected by the registered voters of the precinct through partisan election, a fourth officer is appointed by one of the elected officers and has, on some occasions, been appointed by Defendant Berks County Board of Elections. (Joint Stipulation of Facts ¶ 32). In polling places where more than one voting machine is used, a fifth poll official is appointed by Defendant Berks County Board of Elections, and vacancies are also filled by appointment. *Id.* The only impediment to Defendants' appointing bilingual poll workers for these fourth and fifth positions and potential vacancies is their apparent unwillingness to ensure that poll workers include persons reflective of the community.

■ The Court finds that the Government is likely to prevail on the merits of its claim that the totality of the circumstances demonstrates that Defendants' election practices and policies result in an electoral system that denies equal access to Hispanic voters in violation of Section 2.

**B.** *Irreparable Harm*

In order for a preliminary injunction to be granted, plaintiffs must establish that they will suffer irreparable harm if an injunction is not issued. The "requisite is that the feared injury or harm be irrepara-ble—not merely serious or substantial. 'The word means that which cannot be repaired, retrieved, put down again, atoned for . . . . the injury must be of a peculiar nature, so that compensation in money cannot atone for it. . . .'" *A.O. Smith Corp. v. Federal Trade Comm'n,* 530 F.2d 515, 525 (3d Cir.1976) (quoting *Gause v. Perkins,* 56 N.C. 177, 3 Jones Eq. 177, 69 Am.Dec. 728 (1857)).

■ The Supreme Court has recognized that the "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Federal courts have recognized that the holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm to voters. *See, e.g., United States v. Metropolitan Dade County,* 815 F.Supp. 1475, 1478 (S.D.Fla.1993) (granting temporary restraining order to prevent violation of Section 203); *Dillard v. Crenshaw County,* 640 F.Supp. 1347, 1363 (M.D.Ala. 1986) (granting preliminary injunction to prevent violation of Section 2); *PROPA,* 350 F.Supp. at 611 (granting preliminary injunction to prevent violation of Section 4(e)).

Hispanic voters denied equal access to the electoral process cannot collect money damages after trial for the denial of the right to vote. *See Casarez v. Val Verde County,* 957 F.Supp. 847, 864–65 (W.D.Tex.1997) (granting preliminary injunction because monetary damages could not redress Voting Rights Act violation). Moreover, denial of equal access to the electoral process discourages future participation by voters. *See, e.g., Gomez v. City of Watsonville,* 863 F.2d 1407, 1416 n. 4 (9th Cir.1988) (discussing how voting dis-

crimination may result in depressed voter registration).

The Government has presented evidence that Reading's Hispanic voters have had less opportunity than other voters to effectively participate in Reading's political process in past elections, and it is likely that such harm will continue if Defendants continue to follow their current policies and practices. The impact of the discouragement of equal participation in the democratic system cannot be redressed by money, or any other remedy, following trial. Thus, the Court finds that the irreparable nature of the harm to Reading's Hispanic voters requires preliminary relief.

## C. Whether the Non–Moving Party Will Suffer Irreparable Harm if the Injunction Is Issued

The Court finds that Defendants will not suffer irreparable harm. The Government requests that Defendants engage in reforms necessary to provide equal access to the electoral process for Hispanic and Spanish-speaking citizens. Although these reforms may result in some administrative expenses for Defendants, such expenses are likely to be minimal and are far outweighed by the fundamental right at issue. *See Johnson v. Halifax County,* 594 F.Supp. 161, 171 (E.D.N.C.1984) (administrative and financial burdens on defendant not undue in light of irreparable harm caused by unequal opportunity to participate in county election).

Additionally, there are still nearly two months until the scheduled primary election. Courts have ordered the type of relief requested by the Government within far shorter time periods for defendants to comply. *See Harris,* 593 F.Supp. at 138 (18 days); *Arroyo,* 372 F.Supp. at 765 (24 days); *PROPA,* 350 F.Supp. at 606 (eight days). The Government notes that in Berks County, candidate qualification has

not yet closed, and ballots and other election materials have not been printed. (Pl.'s Mem. Supp. Mot. Prelim. Inj. at 31). Defendants still have ample time to make modifications.

## D. The Public Interest

The Court finds that the public interest will be served by the issuance of a preliminary injunction. "[U]ndoubtedly, the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds,* 377 U.S. at 561–62, 84 S.Ct. 1362. Ordering Defendants to conduct elections in compliance with the Voting Rights Act so that all citizens may participate equally in the electoral process serves the public interest by reinforcing the core principles of our democracy. "In cases such as the present one, where the continued presence of [ ] barriers [to equal protection in the political process] is strongly evident, the public interest commands all appropriate relief necessary to effect the immediate and complete removal of these barriers." *Harris,* 593 F.Supp. at 136.

## VI. Relief

The United States has requested sweeping relief, including requiring bilingual poll workers in 45 of Reading's precincts for the entire 13–hour primary election day, bilingual ballots, extensive training and publication, before election day, of sample ballots, and bilingual advertisements of the location of polling places, availability of assistance, etc. The Court does not have sufficient facts on the record to ascertain whether all of the items of relief requested by the United States are necessary, or even achievable in the 60 days remaining until the primary election. Although the Government, as to some aspects of relief, only asks that Defendants perform on a "best efforts" basis, other requested items of relief are mandatory. In addition, the

Court finds that there has not been sufficient attention paid to the logistics and location of the various polling precincts in the City of Reading or to a cost-benefit analysis.

For all these reasons, and particularly in view of the short time remaining, the Court has decided to appoint, after consultation with and consent from counsel for the parties, a Special Master to work with the parties and their counsel in ascertaining the detailed relief that is necessary and appropriate to carry out the intent of Congress in the context of the realities of Reading.

## VII. *Conclusion*

For the reasons discussed above, Plaintiff's Motion for Preliminary Injunction will be granted. Additionally, a Special Master will be appointed to work with the parties in preparing for the primary election on May 20, 2003, and to ensure that Defendants comply with the Court's Order.[9]

An appropriate Order follows.

---

9. Federal Rule of Civil Procedure 53(b) provides in relevant part:

> A reference to a master shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when the issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.

The Supreme Court has stated that masters may be appointed only "to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause." *La Buy v. Howes Leather Co.,* 352 U.S. 249, 256, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957). The Third Circuit has found referral to a master improper where the matter referred presented "relatively simple questions of fact and law." *Apex Fountain Sales, Inc. v. Kleinfeld,* 818

## *ORDER*

And now, this 18th day of March, 2003, upon consideration of Plaintiffs' Motion for Preliminary Injunction (Doc. No. 9), Defendants' opposition thereto (Doc. No. 12), and an evidentiary hearing held on March 13, 2003, it is hereby

ORDERED that Plaintiff's Motion is GRANTED.

It is further ORDERED as follows:

1. That Defendants Berks County, Pennsylvania; Berks County Commission; Berks County Board of Elections; Timothy Reiver; Mark Scott; Judith Schwank, in their official capacities as members of the Board of Elections; and Kurt Bellman, in his official capacity as Director of Elections, are preliminarily enjoined until further Order of the Court after final hearing, from conducting any further elections that fail to comply with the Voting Rights Act, specifically Sections 4(e), 208, and 2, 42 U.S.C. §§ 1973b(e), 1973aa–6, and 1973; and the guarantees of the Fourteenth and Fifteenth

---

F.2d 1089, 1096 (3d Cir.1987). However, the Third Circuit also has recognized that appointment of a master may be appropriate where implementing the court's order would be "a complex and lengthy process, probably involving monitoring, dispute resolution, and development of detailed enforcement mechanisms." *Id.* at 1097. Of significance is the fact that the primary election is approximately 60 days from the issuance of this Court Order, which will require prompt diligence by the Master, the parties, and their counsel. The Court believes that the sweeping injunctive relief sought in the Government's six-page, detailed proposed order (Doc. No. 9) calls for the expertise of a Special Master knowledgeable about election procedures to work with the parties to determine the most feasible way for Defendants to comply with the Court's Order.

Amendments to the United States Constitution;

2. That until further Order of this Court, the Director of the Office of Personnel Management is authorized to appoint a federal examiner pursuant to Section 3(a) of the Voting Rights Act, 42 U.S.C. § 1973a, to enter and observe election procedures and ballot tabulation pursuant to Section 8 of the Voting Rights Act, 42 U.S.C. § 1973f; and that Department of Justice personnel, including attorneys and staff members, shall be permitted into the polling places for the purpose of coordinating the work of the federal observers;

3. That Defendants shall provide in English and Spanish all written election-related materials, including the official ballot, sample ballots, absentee ballots, voter registration applications, candidate qualification information, notification of elections, polling place changes, polling place signage, any voter information guides or pamphlets provided by the county, voting instructions and procedures at the polls, and other election materials used at the polls, in every precinct in which the registered Hispanic voters constitute more than five percent of the registered voters;

4. After consultation with the parties, and in order to carry out the details of the Court's Preliminary Injunction Order, the Court will appoint a Special Master to work with the parties and their counsel in preparing for the primary election on May 20, 2003, and to ensure that the Court's Order is followed;

5. The Master shall review the pleadings, meet with the parties and/or their counsel, and review the demographics for the City of Reading in terms of those election precincts in which more than five percent of the electorate are Spanish-speaking, and recommend to the Court, after considering logistics, timeliness, and cost-benefit analysis, the following:

A. Those precincts in which one or more bilingual English–Spanish interpreter(s) should be present for the entire day;

B. Those precincts in which such an interpreter need be present for only those hours in which the most heavy voting will occur, and intermittent coverage of those precincts during the remaining hours of the day;

C. The Master shall also review the availability of such bilingual interpreters within the City of Reading, and Defendants' efforts to hire sufficient interpreters to meet the objectives of the Court's Order;

D. The Master shall also review all other relief requested by Plaintiff, including the training and bilingual publicity which the Defendants intend to provide;

E. The Master shall report back to the Court no later than March 27, 2003 with recommendations. The parties will have seven (7) days to confer and file either a stipulation or comments on the Master's recommendations, following which the Court will issue a detailed Order for the conduct of the May 20, 2003 primary election.