The UNITED STATES of America, Plaintiff,

v.

BERKS COUNTY, PENNSYLVANIA; Berks County Commissioners; Berks County Board of Elections; Timothy Reiver; Mark Scott; Judith Schwank, in their official capacities as members of the Board of Elections; Mary Ann Campbell; Karen A. Rightmire; Jeffrey L. Schmehl, in their official capacities as members of the Board of Elections; Kurt Bellman, in his official capacity as Director of Elections, Defendants.

Civil Action No. 03–1030.

United States District Court, E.D. Pennsylvania.

Aug. 20, 2003.

Ralph F. Boyd, Jr., Amy H. Nemko, Joseph D. Rich, Washington, DC, Patrick L. Meehan, Philadelphia, PA, for Plaintiffs.

Maxwell E. Davison, Duane Morris LLC, Allentown, PA, for Movant.

Gregory M. Harvey, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

BAYLSON, District Judge.

## I. Findings of Fact

### A. Background

1. This action was brought on February 25, 2003 by the United States against Defendants Berks County; the Berks County Commissioners; the Berks County Board of Elections; Berks County Commissioners in their official capacities; members of the Berks County Board of Elections in their official capacities; and the Director of Elections in his official capacity.

2. Berks County is a County within the Commonwealth of Pennsylvania and is governed by the laws of that State. (Joint Stipulation of Facts ("Joint Stip.") ¶ 1.)

3. The Berks County Board of Elections has statutory powers, duties, and responsibilities concerning the conduct of elections within the City of Reading, Pennsylvania (referred to in Census listings as "Reading City" and sometimes referred to herein as "Reading City"). *Id.* ¶ 2.

4. Defendants Chairman Timothy Reiver, and Commissioners Mark Scott and Judith Schwank, are County Commissioners and reside in Berks County. *Id.* ¶ 3.

5. At the time the Complaint was filed, County Commissioners Reiver, Scott, and Schwank also served as members of the Board of Elections. Because each Commissioner is running for re-election this year, none can serve on the Berks County Board of Elections, pursuant to 25 PA.STAT. § 2641(c). As a result, Karen A. Rightmire, Mary Ann Campbell, and Jeffrey L. Schmehl have been appointed to serve as members of the Board of Elections and reside in Berks County. (Ex. 49.) As successors in office, they have automatically been substituted as parties pursuant to Federal Rule of Civil Procedure 25(d).

6. Defendant Kurt Bellman is Chief Clerk of the Board of Elections, with statutory duties, powers, and responsibilities concerning the conduct of elections in Berks County. He is also "Director of Elections." Defendant Bellman is a resident of Berks County. (Joint Stip. ¶ 4.)

7. The United States' Complaint alleges that Defendants' election policies and practices deny Hispanic and Spanish-speaking citizens from having an equal opportunity to participate in the election process, in violation of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 *et seq.,* and the guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution. (Pl.'s Compl. ¶ 13.)

8. Specifically, the United States alleges that Berks County employs poll officials who have regularly expressed hostility toward Hispanic and limited English proficient voters, made discriminatory remarks to such voters, prevented or discouraged such voters from participating in the electoral process, and treated Hispanic voters differently than other voters with regard to voter identification requirements, in violation of Section 2 of the Voting Rights Act. *Id.* ¶¶ 13(a), 13(b), 17–20.

---

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1345, as this action was commenced by the United States, and pursuant to 42 U.S.C. § 1973j(f) as the action concerns an alleged deprivation or attempted deprivation of secured rights. Venue is appropriate under 28 U.S.C. § 1391.

9. The United States further alleges that Defendants' election policies and practices illegally condition the right to vote of United States citizens educated in Puerto Rico on such persons' ability to read, write, understand, or interpret matters in English, in violation of Section 4(e) of the Voting Rights Act. *Id.* ¶¶ 13(b), 14(a)-(c), 25–28.

10. The United States further alleges that Defendants have prevented eligible voters from receiving assistance in voting from a person of their choice, in violation of Section 208 of the Voting Rights Act. *Id.* ¶¶ 15, 16, 21–24.

11. This Court, on March 18, 2003, granted Plaintiff's Motion for Preliminary Injunction to prevent Defendants from conducting the May 20, 2003 primary election using practices and procedures that would violate Sections 2, 4(e), and/or 208 of the Voting Rights Act. *United States v. Berks County*, 250 F.Supp.2d 525 (E.D.Pa. 2003); *United States v. Berks County*, No. 03–1030 (E.D.Pa. Apr. 4, 2003) (order supplementing March 18, 2003 preliminary injunction order).

**B. Hispanic Population and Language Ability**

12. According to the 2000 Census, the City of Reading has a total population of 81,207 persons and a voting-age population of 56,913 persons. (Joint Stip. ¶ 5.)

13. According to the 2000 Census, there are 30,302 Hispanic persons in Reading, representing 37.3 percent of the City's total population. *Id.* ¶ 7.

14. According to the 2000 Census, there are 17,278 Hispanic persons of voting age in Reading, representing 30.4 percent of the City's voting age population. *Id.* ¶ 8.

15. According to the 2000 Census, of the 30,302 Hispanic persons in Reading City, 19,054 are of Puerto Rican descent. The 1990 Census reported that 11,705 residents of Reading City were Hispanic of Puerto Rican descent. *Id.* ¶ 9.

16. According to the 2000 Census, approximately half of Reading's Puerto Rican population is first generation, born in Puerto Rico. (Table PCT63H (Reading City, PA), Ex. 4).

17. Some of the 19,054 Hispanic persons of Puerto Rican descent residing in Reading were educated in American-flag schools in which the predominant classroom language was other than English. (Joint Stip. ¶ 10.)

18. The primary language of classroom instruction in Puerto Rico is Spanish. The Puerto Rico Department of Education has promulgated regulations that specify that the language of classroom instruction will be Spanish, the vernacular language of the Commonwealth of Puerto Rico. *See* Department of Education of Puerto Rico, General Regulations of Students, Article III, Section 3.2 (1997) (available at www.de.gobierno.pr/EDUPortal/Estudiantes/RegEst/Articulo03, Ex. 5).

19. Many of Reading's Hispanic residents do not speak English sufficiently well to participate in the electoral process. According to the 2000 Census, almost half of Reading's Hispanic residents of voting age, 8,504 persons, speak Spanish at home and speak English "less than very well." *See* (Custom Table, (Reading City, PA), Ex. 37).

20. The United States analyzed registered voter lists for 2003 for the City of Reading. Based on that analysis, the Court finds that 45 out of 48 precincts in Reading presently contain more than five percent Hispanic registered voters. In addition, 15 precincts contain five to 20 percent registered Hispanic voters, ten precincts contain 20 to 30 percent registered Hispanic voters, seven precincts contain 30 to 40 percent Hispanic registered voters,

and 13 precincts contain over 40 percent Hispanic registered voters. *See* Transcript of Hearing Before Special Master, March 25, 2003, at 10:19–25, 11:1–6 (stipulation by Defendants to Spanish surname methodology and to United States' analysis of 2003 voter registration list).

## C. Socioeconomic Inequity

21. According to the 2000 Census, in 1999 dollars, Hispanics in Reading have a per capita income of only $8,077. Joint Stip. ¶ 12.

22. According to the 2000 Census, non-Hispanic white persons in Reading have a per capita income of $17,317 (in 1999 dollars). *Id.* ¶ 13.

23. According to the 2000 Census, 40.6 percent of Hispanics in Reading live below the poverty line. *Id.* ¶ 14.

24. According to the 2000 Census, 13.9 percent non-Hispanic whites in Reading live below the poverty line. *Id.* ¶ 15.

25. According to the 2000 Census, 58 percent of Hispanics in Reading age 25 or older have not graduated from high school. *Id.* ¶ 16.

26. According to the 2000 Census, 29.1 percent of non-Hispanic whites 25 years or older have not graduated from high school. *Id.* ¶ 17.

27. According to the 2000 Census, Hispanics in Reading are unemployed at a rate of 7.8 percent. *Id.* ¶ 18.

28. According to the 2000 Census, non-Hispanic whites in Reading are unemployed at a rate of 3.4 percent. *Id.* ¶ 19.

29. Some voters in Reading, who have a very low level of literacy, sign their names with an "X." *Id.* ¶ 34.

## D. Berks County Election Practices

30. As set forth below, the Court finds that there is substantial evidence of hostile and unequal treatment of Hispanic and Spanish-speaking voters by poll officials.

31. Poll officials in the City of Reading turned away Hispanic voters because they could not understand their names, or refused to "deal" with Hispanic surnames. (Lee Decl. ¶¶ 9, 10, Ex. 15; Negron Decl. ¶¶ 10–11, 14–15, Ex. 16).

32. Poll officials in the City of Reading made hostile statements about Hispanic voters attempting to exercise their right to vote in the presence of other voters, such as "This is the U.S.A.—Hispanics should not be allowed to have two last names. They should learn to speak the language and we should make them take only one last name," and "Dumb Spanish-speaking people ... I don't know why they're given the right to vote." (Lee Decl. ¶ 9 Ex. 15; Colon Decl. ¶ 7, Ex. 43); *see also* Elkin Decl. ¶ 9, Ex. 17; Caro–Lopez Decl. ¶ 9, Ex. 18; Cruz Decl. ¶ 9, Ex. 44; Aponte Decl. ¶ 7, Ex. 41; Federal Observer Report of Ward 9, Precinct 2 at 19, Ex. 38K; Joint Stip. ¶ 31.

33. Poll officials in the City of Reading placed burdens on Hispanic voters that were not imposed on white voters, such as demanding photo identification or a voter registration card from Hispanic voters, even though it is not required under Pennsylvania law. (Colon Decl. ¶ 9, Ex. 43; Rodriguez Decl. ¶ 10, Ex. 19; Luna Decl. ¶ 9, Ex. 20; Pereyra Decl. ¶ 7, Ex. 46; Arroyo Decl. ¶ 9, Ex. 42; Federal Observer Reports of Ward 6, Precinct 1 at 19, Ex. 38G, and Ward 13, Precinct 2 at 19, Ex. 38T.)

34. Poll officials in the City of Reading required only Hispanic voters to verify their address and told Department staff that they did so because Hispanics "move a lot within the housing project." (Lee Decl. ¶ 10, Ex. 15); *see also* Federal Observer Report of Ward 13, Precinct 4 at 19b, Ex. 38U.

35. Poll officials in the City of Reading boasted of the outright exclusion of His-

panic voters to Voting Section staff during the May 15, 2001 municipal primary election. (Lee Decl. ¶ 9, Ex. 15).

36. Hispanic voters stated that this hostile attitude and rude treatment makes them uncomfortable and intimidated in the polling place, and discourages them from voting. (Martinez Decl. ¶ 11, Ex. 21; M. Viruet Decl. ¶ 11, Ex. 48; Oquendo Decl. ¶ 9, Ex. 45; Pereyra Decl. ¶ 7, Ex. 46).

### E. Lack of Bilingual Poll Officials

37. Under the Constitution and laws of Pennsylvania, three of the polling place officers in each precinct, the election judge, the majority inspector and the minority inspector, are elected by the registered voters of the precinct through partisan elections, and a fourth officer is appointed by one of the elected officers. 25 P.S. § 2671; Joint Stip. ¶ 32. In practice, the Berks County Board of Elections appoints this fourth official itself on some occasions (in consultation with the appropriate elected officer having the legal appointing authority). In addition, in polling places in which more than one voting machine is used, a fifth poll official is appointed by the County Board of Elections. (Joint Stip. ¶ 32.)

38. Under the laws of Pennsylvania, the Berks County Board of Elections has the authority to appoint clerks and machine operators, and to fill vacancies when the elected positions go unfilled. 25 P.S. § 2674 (clerks), 25 P.S. § 2675 (vacancies); Joint Stip. ¶ 32.

39. The United States analyzed Reading city poll worker lists for the years 1998–2001 for persons with Spanish surnames.

40. The Court finds that in 1998, on the basis of this Spanish surname analysis, approximately 2.7 percent of poll officials in the city of Reading were Hispanic. (Joint Stip. ¶ 22.)

41. In 1999, based on this Spanish surname analysis, approximately 1.3 percent of poll officials in the city of Reading were Hispanic. *Id.* ¶ 23.

42. In 2000, based on this Spanish surname analysis, approximately 4.3 percent of poll officials in the city of Reading were Hispanic. *Id.* ¶ 24.

43. In 2001, based on this Spanish surname analysis, approximately 4.2 percent of poll officials in the city of Reading were Hispanic. *Id.* ¶ 25.

44. Some poll officials have acknowledged that they cannot effectively communicate with limited English proficient voters. (Martinez Decl. ¶ 9, Ex. 21).

45. Of the 407 voting machines used in Berks County, 395, including all of the voting machines designated for polling places in Reading City, have an instruction pertaining to machine operation inside the voting machine that is provided by the machine manufacturer, Shouptronic, in both English and Spanish. (Joint Stip. at ¶ 26.)

46. All other written election-related materials, including the ballot sheets that are inserted into the voting machine, sample ballots, absentee ballots, voting instructions posted outside the voting machines, declarations of assistance, and other written election-related materials, were not provided in any language other than English prior to this Court's preliminary injunction. *Id.* ¶ 26.

47. Defendants make available at the County Elections Services office voter registration forms that are provided by the Commonwealth of Pennsylvania in English and Spanish. *Id.* ¶ 27.

48. The Commonwealth of Pennsylvania has developed a computerized statewide voter registration system ("SURE") that generates all correspondence and notices to voters in English and Spanish.

The Berks County Board of Elections instructed Berks County Director of Elections Bellman in June 2001 to accept the SURE statewide voter registration system, including its bilingual capacity, and to seek its implementation in Berks County at the earliest possible date. The SURE system is projected to be operational in Berks County by September 2003 and run in parallel with the existing system for the November 2003 election. The SURE system is not yet implemented in Berks County. *Id.* ¶ 27.

49. Berks County did not provide bilingual oral assistance at the polls prior to this Court's preliminary injunction ordering Defendants to appoint bilingual interpreters. *Id.* ¶ 28.

50. Many limited English proficient voters in Reading are unable to read English-only election materials. (Luna Decl. ¶ 14, Ex. 20; Maldonado Decl. ¶ 12, Ex. 30; Pazmino Decl. ¶ 11, Ex. 29; Rodriguez Decl. ¶ 14, Ex. 19; A. Viruet Decl. ¶ 10, Ex. 47).

51. Many Reading voters attempt to bring a bilingual friend or family member to the polls to assist them in voting. (Arroyo Decl. ¶ 7, Ex. 42; Luna Decl. ¶¶ 10–11, Ex. 20; Maldonado Decl. ¶ 9–11, Ex. 30; Pazmino Decl. ¶ 11, Ex. 29; Rodriguez Decl. ¶ 8 Ex. 19; A. Viruet Decl. ¶ 6, Ex. 47).

52. Poll officials have barred voters from bringing their assistors of choice into the voting booth to assist them. (Luna Decl. ¶ 12, Ex. 20; Maldonado Decl. ¶ 11, Ex. 30; Rodriguez Decl. ¶¶ 13, 15, Ex. 19; Joint Stip. ¶ 29.)

53. The United States brought various examples of the above facts, and others, to the attention of Defendants Reiver, Scott, Schwank, Bellman, and to county counsel, several times over the course of its ongoing two-year investigation. (Joint Stip. ¶¶ 39–47.)

54. Hispanic residents of Reading communicated similar concerns about unequal treatment in the polls to Defendants as early as 1999. (Zayas Decl. ¶ 12, Ex. 32; Joint Stip. ¶ 33.)

55. Numerous articles have appeared in local newspapers outlining Hispanic residents' concerns about equal treatment at the polls. (Exs. 33, 34.)

56. Subsequent to this Court's preliminary injunction order requiring bilingual poll officials, Defendants presented an interpreter recruitment plan that contained a criminal background check to which interpreters would be subjected, despite the lack of a criminal background check for other poll officials. *See* Attachment A to Defendants' Letter to Special Master. Even after this Court ordered that any background checks for interpreters be consistent with and no more extensive than those required for existing Berks County poll officials, Defendants circulated a three-page written application for interpreters. Although there is no written application process for other appointed poll official positions, the interpreter application asked, "Have you ever been arrested or convicted of a felony?" (Ex. 39 at 2.) Applicants were asked to "please explain," and all applicants were asked to sign and affirm the county's authority to investigate "all statements contained in this application for volunteer service as may be necessary for arriving at an acceptance decision." *Id.*

## II. Conclusions of Law

### A. Permanent Injunction

1. The United States is authorized by statute to seek permanent relief for Voting Rights Act violations. 42 U.S.C. § 1973j(d).

2. The Voting Rights Act authorizes the Attorney General to seek "preventative

relief, including an application for a temporary or permanent injunction" whenever any person has engaged or there are reasonable grounds to believe that a person is about to engage in a violation of the Voting Rights Act. 42 U.S.C. § 1973j(d).

■ 3. It is well established that Congress' specific provision for injunctive relief in a statute establishes Congress' determination that irreparable harm will result if proscribed acts are not enjoined. *See, e.g., Instant Air Freight v. C.F. Air Freight,* 882 F.2d 797, 803 (3d Cir.1989) (citing *Government of Virgin Islands, Dept. of Conservation and Cultural Affairs v. Virgin Islands Paving,* 714 F.2d 283, 286 (3d Cir.1983) ("a statutory provision authorizing preliminary injunctive relief upon a showing of probable cause to believe that the statute is being violated may be considered a substitute for a finding of irreparable harm")); *see also United States Postal Service v. Beamish,* 466 F.2d 804, 806 (3d Cir.1972).

4. The "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

■ 5. Denial of the right to participate in an election is by its nature an irreparable injury. *See id.* at 585, 84 S.Ct. 1362, (once it has been established that Section 2 has been violated in legislative apportionment context, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan").

6. Congress has determined that irreparable injury occurs and permanent relief should be provided when a protected class will have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973.

■ 7. The Third Circuit requires that, in deciding whether a permanent injunction should issue, the trial court must consider four factors: (1) whether the moving party has shown actual success on the merits; (2) whether denial of injunctive relief will result in irreparable harm to the moving party; (3) whether granting of the permanent injunction will result in even greater harm to the defendant; and (4) whether the injunction serves the public interest. *See Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001).

8. Courts in this District have treated preliminary injunction hearings as final hearings on the merits permitting entry of a permanent injunction when additional proceedings were unnecessary to rule on plaintiff's claims. *See, e.g., QVC, Inc. v. Tauman,* No. CIV.A.98–1144, 1998 WL 156982 (E.D.Pa. Apr.3, 1998) (Dalzell, J.) (converting preliminary injunction hearing into final hearing on merits, with parties' consent, pursuant to FED.R.CIV.P. 65(a)(2)); *Savin Corp. v. Chud,* No. CIV.A.94–4551, 1994 WL 421309 (E.D.Pa. Aug.8, 1994) (Pollak, J.) (same); *see also Calhoun v. Horn,* No. CIV.A.96–350, 1997 WL 672629 (E.D.Pa. Oct. 29, 1997) (Shapiro, J.) (converting preliminary injunction hearing into non-jury trial on merits).

9. The United States has demonstrated success on the merits of its claims, as set forth in paragraphs 10–47 *infra;* and the standard for issuance of a permanent injunction is satisfied.

**B. Section 4(e)**

10. Section 4(e) of the Voting Rights Act of 1965 protects the right to vote of United States citizens educated in American-flag schools in any state, territory, the District of Columbia, and Puerto Rico, in a language other than English because of

such citizens' inability to read, write, understand, or interpret English. 42 U.S.C. § 1973b(e)(1, 2).

11. The purpose of Section 4(e), according to its main sponsor, Sen. Robert F. Kennedy, was to bring the citizen of "Puerto Rican origin into a status of equality with his fellow citizen[s]." 111 Cong. Rec. 11160.

12. The plain language of Section 4(e) is clear and unambiguous, and has been interpreted broadly by federal courts to prohibit both the explicit conditioning of the right to vote on the ability to speak English, and the conduct of English-only elections. *Arroyo v. Tucker*, 372 F.Supp. 764, 766 (E.D.Pa.1974); *PROPA v. Kusper*, 350 F.Supp. 606 (N.D.Ill.1972), *aff'd*, 490 F.2d 575 (7th Cir.1973); *Torres v. Sachs*, 381 F.Supp. 309, 311 (S.D.N.Y. 1974). *See also Katzenbach v. Morgan*, 384 U.S. 641, 645, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (upholding constitutionality of Section 4(e)).

13. Persons born in Puerto Rico are citizens of the United States *ipso jure.* 8 U.S.C. § 1402.

14. As United States citizens, Puerto Ricans are entitled to unrestricted migration to the mainland states. *Arroyo*, 372 F.Supp. at 766; *PROPA*, 490 F.2d at 578.

15. Unlike naturalized citizens, who must demonstrate a facility with English in order to gain citizenship, Puerto Ricans residing in the United States need not speak or read English to exercise the full benefits of citizenship. *PROPA*, 350 F.Supp. at 609.

16. This case is analogous to *Arroyo v. Tucker*, in which the Court held that Section 4(e) was violated based on finding the following salient facts: the plaintiff class consisted of United States citizens of Puerto Rican descent residing in the City of Philadelphia; such citizens were eligible to vote, but did not read, write, speak, nor comprehend English; English was the sole language in which Philadelphia conducted its election process; and the plaintiffs' affidavits demonstrated that they were unable to participate in the electoral process unless they received assistance in Spanish. 372 F.Supp. at 767–768.

17. The right to vote encompasses more than the right to gain physical access to a voting booth, to mark a ballot or pull a lever. Persons must have the opportunity to comprehend the registration and election forms and the ballot itself to cast an informed and effective vote. *Id.* at 767.

18. The meaningful right to vote extends beyond the four corners of the voting machine. If voters cannot understand English-only ballot language such as the offices for which candidates are running, propositions, bond authorizations, and constitutional amendments, as well as printed advertisements of polling place locations and sample ballots, their right to vote effectively is diminished. *Berks County*, 250 F.Supp.2d at 527.

19. Voters who cannot speak or understand English may have difficulty establishing their right to vote and their right to assistance in voting under Section 208 of the Voting Rights Act, 42 U.S.C. § 1973aa–6. *Berks County*, 250 F.Supp.2d at 527.

20. Defendants' use of an English-only election process effectively conditions the right to vote for Reading's sizeable Puerto Rican community, many of whom attended school in Puerto Rico, on the ability to read, write, and understand English.

21. Defendants' failure to provide Spanish-language oral and written assistance for Reading's large Puerto Rican population denies this group their right to

effectively register a political choice, in violation of Section 4(e).

### C. Section 208

22. Section 208 of the Voting Rights Act, 42 U.S.C. § 1973aa–6, provides: "[A]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."

■ 23. The legislative history of Section 208 reveals that Congress viewed Section 208, as it applied to illiterate voters, as a corollary to the nationwide ban on literacy tests. *See* S.REP. No. 97–417, at 63 (1982), U.S.Code Cong. & Admin.News 1982, at 177, 241–242. Congress concluded that "the only kind of assistance that will make fully 'meaningful' the vote of the blind, disabled, or those who are unable to read or write, is to permit them to bring into the voting booth a person whom the voter trusts and who cannot intimidate him." *Id.* at 62, U.S.Code Cong. & Admin.News 1982, at 241.

24. When Defendants deny Spanish-speaking voters in Reading the right to bring their assistor of choice into the voting booth, voters feel uncomfortable with the process, do not understand the ballot, do not know how to operate the voting machine, and cannot cast a meaningful vote, in violation of Section 208.

### D. Section 2

25. Section 2(a) of the Voting Rights Act, as amended in 1982, prohibits any state or political subdivision from imposing or applying any "qualification or prerequisite" to voting or any "standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group. 42 U.S.C. § 1973(a). A violation of Section 2(a) is established where, "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

■ 26. Section 2 ensures that minority voters are free from any election practice "which operate[s], designedly or otherwise" to deny them the same opportunity to participate in all phases of the political process as other citizens. S.REP. No. 97–417, at 28 (1982), U.S.Code Cong. & Admin.News 1982, at 177, 205. The critical question in a Section 2 claim is "whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Thornburg v. Gingles,* 478 U.S. 30, 63, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

27. Congress extended the Voting Rights Act in 1975 to cover certain language minority groups, including persons of Spanish heritage. 42 U.S.C. § 1973(c)(3); 1973aa 1a(e). When expanding the Voting Rights Act to cover these language minority groups, Congress found that "voting discrimination against citizens of [such] minorities is pervasive and national [in] scope." 42 U.S.C. § 1973b(f)(1).

■ 28. Section 2 applies nationwide, and wherever the totality of circumstances demonstrates that a jurisdiction's political processes are not equally open to participation by minority voters in that its members have less opportunity than other

members of the electorate to participate in the political process, a violation of Section 2 has occurred. Courts have found that Section 2 claims may be brought to challenge election officials' failure to provide language assistance, *Hernandez v. Woodard*, 714 F.Supp. 963 (N.D.Ill.1989), and election officials' failure to appoint minority poll workers, *Harris v. Graddick*, 593 F.Supp. 128, 132 (M.D.Ala.1984).

29. Hispanics in Reading suffer from significant socioeconomic inequality, which is ordinarily linked to lower literacy rates, unequal educational opportunities, and depressed participation in the political process. *See, e.g., Gingles*, 478 U.S. at 69, 106 S.Ct. 2752.

30. Election officials have permitted poll officials to express hostility toward Hispanic and Spanish-speaking voters.

31. Hispanic voters have been subject to unequal treatment at the polls, including being required to show photo identification where white voters have not been required to do so.

32. Hispanic residents in Reading have been severely under represented as poll workers. *Berks County*, 250 F.Supp.2d at 539.

33. The only impediment to Defendants' appointment of bilingual persons to serve as clerks or machine inspectors, and to fill vacant elected poll worker positions, was Defendants' apparent unwillingness to ensure that poll workers included persons reflective of the community. *Id.*

34. The adverse impact of hostility toward minority voters on equal access to polling places is severe. *See Harris*, 593 F.Supp. at 131 n. 3 (finding support for Section 2 violation in substantial evidence of "recent unpleasant encounters" between non-minority poll workers and minority voters).

35. Spanish-speaking · voters in Berks County faced several substantial barriers to casting an effective ballot prior to issuance of the preliminary injunction: English-only election notices and materials; a dearth of bilingual poll officials; and barriers to voters' ability to receive assistance from the person of their choice.

36. The lack of minority poll officials alone is a serious impediment to Hispanic voters gaining equal access to the polls. In *Harris*, the court found that there was gross underrepresentation of black persons among poll officials across the state of Alabama, and that such underrepresentation substantially "impede[d] and impair[ed] the access of black persons to the state political process" in violation of Section 2. 593 F.Supp. at 137. The dearth of minority poll workers was found to be an independent Section 2 claim when accompanied by evidence of past or present discrimination against the minority voters. *See id.*

37. The totality of the circumstances in this case demonstrates that Defendants' practices and procedures result in an electoral system in which Hispanic and Spanish-speaking voters have less opportunity than other members of the electorate to participate in the electoral process.

### E. Federal Examiners

38. The Voting Rights Act expressly permits the Court to appoint Federal examiners as a part of a final judgment. Section 3(a), 42 U.S.C. § 1973a(a), provides:

> Whenever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth and fifteenth Amendment ... the court shall authorize the appointment of Federal examiners by the Director of the Office of Personnel Management in accordance with [section 1973d of this title] to serve for such period of time ... as the court

shall determine is appropriate to enforce the voting guarantees of the fourteenth and fifteenth amendment ... as part of any final judgment if the court finds that violations of the fourteenth and fifteenth amendment justifying equitable relief have occurred in such State or subdivision.

39. The Director of the Office of Personnel Management, when authorized by the Court to appoint a Federal examiner pursuant to Section 3(a) of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973a(a), may assign federal observers pursuant to Section 8 of the Voting Rights Act, 42 U.S.C. § 1973f.

40. Federal observers have the authority to enter and attend any place where elections are administered, in accordance with Section 6 of the Voting Rights Act, 42 U.S.C. § 1973d, and Section 8 of the Voting Rights Act, 42 U.S.C. § 1973f, for the purpose of observing whether persons who are entitled to vote are being permitted to vote, and to enter and attend at any place for tabulating the votes cast at any election held in such subdivision for the purpose of observing whether votes cast by persons entitled to vote are being properly tabulated. 42 U.S.C. § 1973f.

### F. Conclusion

41. The United States has demonstrated that Reading's Hispanic voters have enjoyed less opportunity than other voters to participate in the political process in past elections. The harm suffered by Reading's Hispanic voters in past elections will occur in future elections if Defendants follow their past policies and practices. *Berks County,* 250 F.Supp.2d at 541.

42. The impact of the discouragement of equal participation in the democratic system cannot be redressed by money or any other remedy and constitutes irreparable harm. *Id.*

43. Defendants will not suffer irreparable harm if a permanent injunction is issued. Any small additional monetary expense to Defendants to conduct the election in compliance with the Voting Rights Act is far outweighed by the important fundamental right involved in this case. *Id.; see also Johnson v. Halifax County,* 594 F.Supp. 161, 171 (E.D.N.C.1984) (administrative and financial burdens on defendant not undue in light of irreparable harm caused by unequal opportunity to participate in county election).

44. The public interest is served by entry of a permanent injunction. Ordering Defendants to conduct elections in compliance with the Voting Rights Act so that all citizens may participate equally in the electoral process serves the public interest by reinforcing the core principles of our democracy. *Berks County,* 250 F.Supp.2d at 541 (citing *Harris,* 593 F.Supp. at 136).

45. A permanent injunction is warranted that prohibits further use of English-only elections in the City of Reading; and requires Defendants to comply with Sections 4(e), 208, and 2 of the Voting Rights Act; and authorizes the appointment of Federal examiners to serve through 2007.

46. Defendants' knowledge of these violations and reluctance to remedy them absent court orders further demonstrates the need for a permanent injunction.

47. Judgment will be entered in favor of the United States and against Defendants.

### *ORDER*

AND NOW, this 20th day of August, 2003, upon consideration of Plaintiff's Motion for Permanent Injunction and Entry of Final Judgment, all evidence in the record, the parties' stipulation that all evidence submitted in support of the prelimi-

nary injunction is submitted for purposes of the Motion for Permanent Injunction, Defendants' waiver of their right to a trial on the merits, and the interests of justice, this Court enters this Order as a final judgment in the instant action.

Accordingly, it is hereby ORDERED as follows:

1. Defendants Berks County, Pennsylvania; the Berks County Commissioners; the Berks County Board of Elections; Timothy A. Reiver; Mark C. Scott; Judith L. Schwank; Mary Ann Campbell; Karen A. Rightmire; Jeffrey L. Schmehl; Kurt Bellman; and their successors in office, are enjoined from conducting any further elections that fail to comply with the Voting Rights Act of 1965, as amended, specifically Sections 2, 4(e), and 208; and the guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution.

2. To enforce the voting guarantees of the Fourteenth and Fifteenth amendments to the United States Constitution, the Director of the Office of Personnel Management is authorized to appoint Federal examiners in accordance with section 42 U.S.C. § 1793d to serve through June 30, 2007, in the City of Reading, County of Berks, Pennsylvania. During the service of the examiner, the Director of the Office of Personnel Management, at the request of the Attorney General, may assign one or more persons, who may be officers of the United States, to enter and observe election and ballot tabulation procedures pursuant to Section 8 of the Voting Rights Act, 42 U.S.C. § 1973f; and Department of Justice personnel, including attorneys and staff members, shall be permitted into the polling places for the purpose of coordinating the work of the federal observers. The United States shall give notice of its intent to monitor a particular election.

3. Defendants shall provide in English and Spanish all written election-related materials, including the official ballot, sample ballots, absentee and alternative ballots, voter registration applications, candidate qualification information, notification of elections, polling place changes, polling place signage, any voter information guides or pamphlets provided by the county, voting instructions and procedures at the polls, and other election materials used at the polls, in every precinct in which registered Hispanic voters constitute more than five percent of the registered voters.

4. In each precinct in which registered Hispanic voters constitute at least five percent of the registered voters, Defendants shall appoint and assign at least one poll official or interpreter bilingual in Spanish and English. In each precinct in which registered Hispanic voters constitute 40 percent or more of the registered voters, Defendants shall appoint at least two poll officials or interpreters bilingual in Spanish and English.

5. Defendants are required to use all practicable means to recruit, engage as temporary County employees, and train persons to serve as bilingual poll officials or interpreters in all elections in the City of Reading. If necessary to recruit a sufficient number of bilingual poll officials to satisfy the requirements of this Order, Defendants shall utilize the methods set forth in paragraph 10, *infra.*

6. Defendants shall train the bilingual poll officials, including interpreters, in the translation of the entire ballot, all election-related forms used in the polls on election day, and the voting process (e.g. how to operate voting machines) so that bilingual election officials will be able to provide a full and accurate translation.

7. Bilingual poll officials shall be present in all designated polling places for the standard time expected of an elected or appointed poll official, i.e., twelve hours of the thirteen hours that polls are open, thus

allowing one hour for breaks. Bilingual poll officials shall be treated equally to other elected and appointed poll officials in all other respects and shall not be subject to additional application requirements, background checks, or other disparate conditions of employment.

8. Defendants shall ensure that voters are permitted to have assistance in voting, including assistance in the voting booth, by a person of their choice as provided by 42 U.S.C. § 1973aa–6. The voter may choose anyone to provide assistance as long as the assistor is not the voter's employer or union officer or agent of the voter's employer or union. 42 U.S.C. § 1973aa–6. The assistor will be permitted to assist in all aspects of the voting process. Defendants shall not construe 25 P.S. § 3058 to limit a voter's choice of assistor or to prevent an assistor from assisting more than one voter.

9. Defendants shall maintain at least two dedicated telephone lines for use on election day answered in the Spanish language by a trained bilingual employee and shall provide adequate bilingual staffing on these telephone lines throughout the day while polls are open. Poll workers shall provide and/or post information in each polling place within the City of Reading describing the availability of telephone assistance.

10. Defendants shall publicize in Spanish and English prior to the election the availability of bilingual election materials, interpreters at the polling places, Spanish language telephone assistance by calling the dedicated telephone lines as described in paragraph 9 above, and the right of voters to bring their assistor of choice under the allowances provided for in Section 208 of the Voting Rights Act. Publicity methods shall include providing notices in English and Spanish to the Spanish-language media, Hispanic community organizations (e.g., voting organizations, businesses, churches, senior citizen centers, etc.), Hispanic elected officials, Hispanic candidates, and the county election Director's website.

11. Defendants' training of all poll officials shall include making them aware that all eligible citizens have the right to cast a ballot; making them aware and advising eligible voters of the right of certain voters to have assistance in Spanish by a person of their choice, including inside the voting booth; and making them aware of their obligation to comply with all other applicable provisions of the Voting Rights Act of 1965, including Section 11, 42 U.S.C. § 1973i.

12. Defendants shall assign one or two employees to act as the Spanish Language Assistance Coordinator(s), for at least three months prior to a federal, state, county, or municipal election, including primary elections, to help carry out the requirements of this Order. The Coordinator(s) shall be bilingual in English and Spanish, and shall be trained in all aspects of the election process by the Berks County Director of Elections.

13. The Coordinator(s) and the Berks County Director of Elections shall meet with representatives of the Hispanic community at least one month prior to each election and solicit their views on how to ensure the effectiveness of bilingual assistance for Spanish speaking voters. While not required to adopt any views or suggestions made in any such meetings, the Coordinator and the Berks County Director of Elections shall consider these views and/or suggestions in good faith.

14. The responsible Coordinator(s) shall investigate all allegations of poll worker hostility toward Hispanic and/or Spanish speaking voters, and shall report the results of all such investigations to the Berks County Board of Elections, the Director of Elections, and counsel of record

for the United States. Such hostile conduct shall include but is not limited to occasions on which a poll worker has failed or refused to permit any person to vote who is entitled to vote; intimidated, threatened, coerced, or attempted to intimidate, threaten or coerce any person for voting or attempting to vote or any person for urging or aiding any person to vote or attempting to vote. Copies of complaints and relevant documentation shall be provided to the United States within 30 calendar days after being received, and shall include the complainant's name and contact information, language spoken, nature of the request and complaint, and how the matter was resolved.

15. At least ten calendar days before each federal, state, county, and municipal election, including primary elections, in the City of Reading, Defendants shall provide to counsel for the United States: (a) the name and polling place of each precinct designation; (b) the name and title of each poll official elected or appointed to serve at each polling place (including identification of those who are bilingual in English and Spanish); (c) a copy of the most recent voter registration list on computer disk in a format to be agreed upon; and (d) a set of all written materials to be provided to voters at the upcoming election. Within 30 calendar days after each such election, Defendants shall provide to counsel for the United States an updated report regarding any changes in items (a)-(d) above that occurred at the election, as well as copies of documents pertaining to the hiring and training of bilingual poll officials in the preceding election.

16. This Order shall remain in effect through June 30, 2007. Plaintiff may move the Court for good cause shown to extend this Order.

17. The Court shall retain jurisdiction of this case to enter further relief or such other orders as may be necessary for the effectuation of the terms of this Order and to ensure compliance with Sections 2, 3(a), 4(e), 11(a), 12(d) and 208 of the Voting Rights Act.

18. The Clerk shall enter final judgment in favor of Plaintiff and against Defendants.