REVISED APRIL 1, 2009
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 27, 2009

Charles R. Fulbruge III
Clerk

No. 07-60588

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

IKE BROWN, Individually and in his official capacities as Chairman of
Noxubee County Democratic Executive Committee and Superintendent of
Democratic Primary Elections; NOXUBEE COUNTY DEMOCRATIC
EXECUTIVE COMMITTEE

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Mississippi, Jackson

Before KING, DENNIS, and ELROD, Circuit Judges.

KING, Circuit Judge:

Defendants–Appellants Noxubee County Democratic Executive Committee
and its chairman, Ike Brown, are tasked, among other things, with organizing
and orchestrating Noxubee County's Democratic primary and runoff elections.
After investigating the methods by which defendants conducted the county's
2003 elections, the United States brought this suit on behalf of the county's
white voters—the minority in that county—for alleged violations of § 2 of the
Voting Rights Act.  The district court considered the evidence presented during

a two-week bench trial and concluded that defendants indeed violated § 2 by intentionally diluting the voting power of white Democrats. With the 2007 primary elections fast approaching, however, the court delayed announcing a remedy. After that primary—and in large part due to the events of that primary—the district court tailored a remedial order to prevent the recurrence of electoral abuses. Defendants now challenge both the district court's liability holding and its remedial order.

## I. FACTS AND PROCEEDINGS

Because the facts of this case are well set out in the district court's thorough opinion, United States v. Brown, 494 F. Supp. 2d 440 (S.D. Miss. 2007), we do not here provide an exhaustive recital of the court's findings; instead, we summarize the key facts forming the foundation for the district court's liability holding. Additionally, we describe the events of the August 2007 primary election preceding and precipitating that court's remedial order. Before discussing either the liability or remedial proceedings, however, we briefly set forth Mississippi's election law and process because, by abusing their authority over this process, the Noxubee County Democratic Executive Committee ("NDEC") and Ike Brown, as the committee's chair (collectively, "defendants"), were found to have intentionally discriminated against the county's white voters in violation of § 2 of the Voting Rights Act.

A.    Mississippi Electoral Processes

In addition to serving as the local governing body of the Democratic Party, NDEC and its chair are responsible for conducting the county's Democratic primary elections. See MISS. CODE ANN. § 23-15-263(1).[1] Such a task includes

---

[1] Section 23-15-263(1) states that:
[T]he county executive committee at primary elections shall perform all duties that relate to the qualification of candidates for primary elections, print ballots for primary elections, appoint the primary election officers, resolve contests in regard to primary elections, and perform all other duties required by law to be performed by the county executive committee . . . .

qualifying candidates, printing absentee ballots, preparing ballots for the polls, appointing and training poll managers and clerks to staff the polls on election day, and generally supervising the primary election. See id. § 23-15-263(1).[2] The district court's determinations, in both the liability ruling and the remedial order, focus specifically on the defendants' failures with regard to observing Mississippi's absentee ballot requirements, applying Mississippi's specific method for counting absentee ballots, and preventing the illegal assistance of voters.

Mississippi's absentee voting provisions are "intended to ensure the integrity of absentee ballots," and, accordingly, the Mississippi Supreme Court "requires strict compliance with the statutes concerning absentee ballots." Lewis v. Griffith, 664 So. 2d 177, 185 (Miss. 1995). In Mississippi, a voter may vote by absentee ballot either by appearing in person at the county registrar's office or by requesting an absentee ballot by mail and mailing the ballot back. See MISS. CODE ANN. § 23-15-715. To vote by mail, the voter must meet specific statutory requirements: she must either be at least sixty-five years old; disabled; temporarily residing outside the county; or staying with a spouse, parent, or child who is hospitalized more than fifty miles away on election day. See id. § 23-15-715(b). After applying to vote by absentee ballot, the voter then receives a ballot and its corresponding return envelope, on the back of which is printed an affidavit for the voter to complete. See id. § 23-15-635. In the case of an

---

See also id. § 23-15-401 ("The term 'officials in charge of the election' shall mean . . . the county executive committee . . . .").

[2] With specific regard to manning the polls, the executive committee must meet no later than two weeks prior to a primary election in order to appoint managers and, where permitted, clerks to work at each polling precinct. See id. § 23-15-265(1). The committee must name at least three managers per precinct, see id. § 23-15-231, but it may designate up to an additional three persons to serve either as managers or clerks, see id. § 23-15-235. Additional clerks may be appointed if the voting precinct contains more than 500 registered voters. Id. The committee must then sponsor training sessions for the election managers no less than five days prior to the primary election. See id. § 23-15-239(1).

absentee voter who is not disabled, this affidavit must be completed in the presence of an official authorized to administer oaths—i.e., a notary public. See id. § 23-15-721. Finally, the voter must sign her name across the envelope's flap. See id. § 23-15-633.

On election day, the absentee ballots are inspected for compliance with the above statutes and, if compliant, are counted. Candidates or their representatives may observe this counting and may lodge challenges against a ballot or a ballot's affidavit. See id. §§ 23-15-577, -581, -643.[3] The counting process is set out by § 23-15-639(1): first, the manager must announce the name, address, and precinct inscribed on each envelope; and second, the signature of the voter's absentee ballot application must be compared to the signature on the absentee ballot's envelope. See also id. § 23-15-643 ("If the officials are satisfied that the affidavit is sufficient and that the absentee voter is otherwise qualified to vote, an official shall announce the name of the voter and shall give any person present an opportunity to challenge in like manner . . . ."). If the affidavit is insufficient or the signatures fail to match, then the ballot must be marked "REJECTED" and kept apart from the accepted ballots. See id. § 23-15-641.

Finally, Mississippi permits assisting voters while they cast their ballots at the poll, but this permission is not without limit. Assistance may only be provided after a voter requests it and if the voter is either blind, disabled, or

---

[3] Section 23-15-577 states that the poll managers must publicly count the ballots and that:

> Each candidate shall have the right, either in person or by a representative to be named by him, to be present at the polling place, and the managers shall provide him and his representative with a suitable position from which he or his representative may be able to carefully inspect the manner in which the election is held. He or his representative shall be allowed to challenge the qualifications of any person offering to vote, and his challenge shall be considered and acted upon by the managers.

Regarding observation of the ballots, § 23-15-581 dictates that "[c]andidates or their duly authorized representatives shall have the right to reasonably view and inspect the ballots as and when they are taken from the box and counted."

4

unable to read.  See id. § 23-15-549 ("Any voter who declares to the managers of the election that he requires assistance to vote by reason of blindness, disability or inability to read or write may be given assistance by a person of the voter's choice . . . ." (emphasis added)); see also O'Neal v. Simpson, 350 So. 2d 998, 1009 (Miss. 1977) ("We hold that before any voter may receive assistance in marking his ballot, he must first request assistance from the managers of the election who must be satisfied that the voter is either blind, physically disabled or illiterate and needs assistance in marking his ballot. . . . [A]ll voters are not entitled to assistance in marking their ballots, but only the blind, physically disabled or illiterate may receive assistance in marking their ballots.").

With this picture of Mississippi's election requirements in mind, we turn to the district court's findings regarding how defendants' conduct abused this process to the detriment of the county's white voters.

B.    The Liability Proceedings

Noxubee County's voting population is 65.7% black and 32.5% white.  Of the county's registered Democrats, 80% are black and 20% are white.[4] Additionally, the parties concede and the government's expert showed that the county's voting is racially polarized, meaning that "there is a consistent relationship between [the] race of the voter and the way in which the voter votes."  See Thornburg v. Gingles, 478 U.S. 30, 53 n.21 (1986).

The alleged violations of white voters' rights occurred during the 2003 primary and subsequent runoff elections.  The district court concluded that during that time "defendants engaged in improper, and in some instances fraudulent conduct, and committed blatant violations of state election laws[] for the purpose of diluting white voting strength."  Brown, 494 F. Supp. 2d at 485. White votes were diluted by defendants' involvement in (1) obtaining large

_____

[4] All of the county's Republicans at the time were white.

5

numbers of defective absentee ballots from black voters; (2) facilitating the improper counting of absentee ballots in order to ensure that the defective ballots were counted; and (3) permitting the improper assistance of black voters. Evidence bearing on defendants' intent included: a press release issued by Brown that listed 174 white Democrats whom he intended to challenge were they to vote in the 2003 Democratic primary; statements made by Brown before and during his chairmanship of NDEC; the departure from the normal practice of hiring poll workers in proportion to the party membership's racial makeup; and the lack of any legitimate explanation for defendants' conduct.

The rate of absentee voting in Noxubee County is abnormally high relative to that of its sister counties: the government's expert reported that, while roughly 20% of the ballots in Noxubee County are absentee ballots, other Mississippi counties experience an absentee voter rate anywhere from 3% to 6%. To maximize the number of absentee ballots, a common and legitimate practice in Mississippi is for a candidate or her supporters to hire notaries and dispatch them so that they may call on possible constituents who have applied to vote absentee—Brown did no less, as the evidence showed that he financed the notary fees of more than fifty notaries. But the district court found evidence demonstrating that defendants went beyond any legitimate bounds of this practice. First, the court heard testimony concerning the actions of Carrie Kate Windham, an NDEC member whose notary fee was paid by Brown. In one instance, Windham recruited Nikki Halbert, a black voter who did not qualify to vote absentee, to vote by absentee ballot. Although Halbert did not apply to vote absentee, she received an absentee ballot in the mail and completed it. Windham returned to collect the ballot, which she carried away in its unsealed and unsigned envelope. When shown the signatures on the application and

envelope at trial, Halbert maintained that neither was hers.[5] Two additional black voters testified that Windham recruited them to vote by absentee ballot despite the fact that they did not meet the requirements and had not applied to do so. More troubling, these two voters—who did not request voting assistance—indicated that Windham selected candidates for the voters and marked their ballots for them. Second, Mable Jamison, an independent notary,[6] testified that Brown phoned her in an effort to dissuade her from collecting absentee ballots from voters that "his people," such as Windham, intended to collect: "[h]e pretty much said that his people had did the initial leg work and I shouldn't be picking up his ballots." Id. at 459. Finally, the court heard testimony from Gwendolyn Spann, whom Brown recruited to serve as a notary. After receiving her notary materials, paid for by Brown, Spann explained that she would receive a list of voters to contact, all of whom were black, and that Brown paid her based on the amount of work she did.

These examples illustrated defendants' attempts to obtain a disproportionate number of absentee ballots from black voters; nonetheless, "[a]n absentee ballot can only be effective if it is counted." Id. at 461. To that end, the evidence illustrated defendants' permitting the improper counting of absentee ballots and defendants'—specifically, Brown's—direct influence over poll managers in counting the ballots. Defendants deviated from the state Democratic party's practice of employing a racially representative corps of poll managers and clerks; instead, they raised a workforce of only 6% whites in a

---

[5] Additionally, the court permitted Halbert to testify a second time at trial because, after her initial testimony, Windham confronted Halbert about her testimony outside of court. According to Halbert, Windham arrived at Halbert's home, stated that "[w]e black people need to stick together," and suggested that Halbert should "tell them that you probably didn't understand what you was being asked, the reason you said what you said." Id. at 460 n.34. Despite this, Halbert's testimony remained unchanged.

[6] Jamison was "independent" in that she did not seek out absentee ballots for any particular candidate. She aided absentee voters on her own as a form of community service.

county where 20% of registered Democrats are white. While counting the absentee ballots, the workers failed to count the absentee ballots in accordance with Mississippi law by neglecting to read each voter's name aloud, preventing candidates and their representatives from clearly observing the ballots as they were counted, and ignoring challenges brought by candidates and their representatives. NDEC members were involved in this conduct: at the Shuqualak precinct, poll managers were directed by Gary Naylor, an NDEC member, to continue briskly counting absentee ballots despite complaints from a candidate's representative that the speed at which the managers were counting prevented the reasonable viewing and inspection of the ballots. At the Title One precinct, NDEC members Dorothy McCoy, a poll manager, and Windham, not a poll manager, ignored a challenge to an absentee ballot and summarily counted the ballot. As for Brown, his involvement was particularly pervasive. At the West Macon precinct, Octavia Stowers, a poll manager, called Brown on a cell phone to tell him that challenges were being lodged against absentee ballots; Stowers then announced, "Ain't no ballots being challenged. I was instructed by Ike not to—can't no ballots be challenged," and she thereafter refused to consider further challenges. Id. at 464. At the East Macon precinct, managers were unsure how to proceed when the absentee ballot of a voter who later voted in person was mixed in with the remaining, uncounted absentee ballots. Brown, according to witness testimony, entered the scene and ordered the poll managers to "[c]ount every vote, count them every one right now. Pick up those absentee ballots that are on that table and bring them over here and put them in that machine right now." Id. at 465. The poll managers complied without any further examination of the absentee ballots. Finally, at the Brooksville precinct during the 2003 primary runoff, testimony showed that Brown inspected the absentee ballots the night before the runoff and placed yellow post-it notes on select ballots that he wished to be rejected. On the note,

8

he indicated the reason why he considered the ballot deficient. The next day, Brown told the poll managers "I've already went through these absentee ballots and I put y'all's stick-on stickers on the ballots that I want rejected and the rest of them is all right to count." Id. at 466. Brown's directions were followed without deviation. All of the marked ballots were rejected, including white voters' absentee ballots shown to possess the same deficiencies as black voters' ballots that were counted. Although all of defendants' witnesses who addressed these issues denied that any step was skipped in the ballot-counting process, that any candidate or representative was prevented from viewing the ballots, that any challenge was ignored, and that Brown influenced any decision made regarding whether to count or reject a ballot, the court found the detailed accounts of the government's witnesses more credible.

The district court also heard evidence concerning the illegal assistance of black voters at the polling places. Witnesses recounted that both black poll workers and unidentified black individuals repeatedly approached black voters, who made no request for assistance, in order to solicit the provision of assistance. This assistance involved marking the ballots for the voter without consultation, and no such assistance was proffered to white voters. Defendants' witnesses denied that such assistance was made and contended that voting assistance was provided only when requested; again, the court considered the government's witnesses credible.

Finally, the district court considered evidence bearing on defendants' intent. The government presented a press release issued by Brown prior to the 2003 primary election. In it, Brown named 174 Democratic voters, all white, whom he intended to challenge were they to vote in the 2003 Democratic primary. The press release purported to base this prospective challenge either on asserting that the voter moved outside the county or on claiming that the

9

voter was not loyal to the Democratic party.[7]  As only white voters were listed, the district court considered it "not credible in the least that Brown was only aware of whites who had moved and were consequently no longer eligible to vote."  Brown, 494 F. Supp. 2d at 477.  Further, while all of the county's Republicans are white, the court noted that not all Democrats are black and that Brown failed to identify any investigation done or reasons why he suspected the named voters were in fact Republicans other than on the basis of their race.  Although no challenges were in fact brought, testimony revealed the effects of this list: one voter was so intimidated that she did not vote; another was intimidated to the point that she did not feel she could approach the polls alone.

The court considered statements made by Brown both during and before his chairmanship of NDEC in which he referenced race as a means to garner support for black candidates.  In 1995, he urged voters to "Keep Hope Alive [and] Vote Black in '95" in an open letter to Noxubee County voters.  As chair of the NDEC, Brown voiced the opinion that all of the county's elected officials should be black; to that end, he baldly accused white elected officials of racism, without support, in an effort to arouse black voters to vote against a white official and to support a black challenger.[8]  He also recruited black individuals to run for office even though he knew the individuals failed to meet the position's qualifications.  For example, he recruited a black attorney to run for county prosecuting attorney against the white incumbent notwithstanding the fact that the

---

[7] The latter challenge relied on § 23-15-575, which states that "[n]o person shall be eligible to participate in any primary election unless he intends to support the nominations made in the primary in which he participates."  Mississippi's Attorney General issued an opinion addressing the enforceability of this provision and strongly cautioned against challenging voters in this regard.  See Op. Miss. Att'y Gen. (July 21, 2003), 2003 WL 21962318.

[8] We emphasize that Brown is not being punished for the content of his speech.  The district court made clear that it considered Brown's statements only insofar as they illuminated his motive and intent in connection with the conduct that did violate § 2.  See id. at 452 (stating that Brown's statements "give context and meaning to his actions as NDEC chairman").

challenger did not meet the residency requirement for the position. When the incumbent, Ricky Walker, attempted to contest his challenger's qualifications with the NDEC, Brown and NDEC refused to permit Walker to present his argument and barred Walker from the remainder of the proceedings, which were held at Brown's home. Walker later successfully challenged the candidate's qualifications in state court.

Considering all of this evidence, the district court concluded that defendants engaged in a "pattern of episodic behavior intended to deny white voters equal participation in the political process." Id. at 482. By soliciting large numbers of defective black absentee ballots, wielding their authority to ensure that these ballots were counted, and permitting the improper assistance of black voters—all with the intent to dilute the voting power of white Democrats—defendants were held to have violated § 2 of the Voting Rights Act.

C.    The Remedial Proceedings

After concluding that defendants were liable under § 2, the court ordered that each party submit a proposed remedy. To that end, the court considered testimony at two evidentiary hearings: one held prior to the August 2007 primary election; the other, after the election. Upon considering the evidence, the district court issued its remedial order.

On July 30, 2007, the district court conducted the first evidentiary hearing. There, the court considered the respective remedies proffered by the government and defendants. The government urged the district court to appoint a Referee-Administrator to "carry out almost all aspects of Democratic Primary elections, though the [d]efendants would otherwise be permitted to operate party functions as usual." The government further requested that the court delay the county's upcoming primary election. Additionally, the government sought to limit defendants' access to the Circuit Clerk's office two weeks prior to each election and their access to polling places on election day. In their response,

11

defendants asserted that they had undertaken various voluntary steps in an effort to improve the county's electoral process and that these steps had cured the practices found violative of the Voting Rights Act. Defendants further represented to the court that Brown would not participate in the absentee ballot process, that absentee ballots would be properly counted, that candidates and their representatives would be permitted to challenge absentee ballots, that individuals would not be permitted to offer unsolicited assistance to voters, and that poll managers would generally be instructed according to the MISSISSIPPI POLL MANAGER GUIDE. During the hearing, Brown testified that the only part he intended to play in the primary election was to certify the results. In view of these representations, the parties jointly recommended that the court permit the August 2007 primary election to go forward and to delay the subsequent runoff; the district court acquiesced and issued an order accordingly. Federal observers were authorized and, in August, the primary election took place.

At the second hearing, convened August 22, 2007, the district court was presented with testimony concerning the events of the primary election. Despite defendants' representations, the election replayed many of the faulty characteristics of the 2003 elections. First, Brown remained involved in the electoral process: he had access to the absentee ballots the night before the election; he was responsible for assigning and replacing poll managers; and he interjected himself, yet again, into the ballot-counting process at two separate precincts. At the Earl Nash precinct, Mildred Reed, a poll manager, received a call from Brown in which he ordered her to "rush up" the counting process. At the Macon Fire Station precinct, testimony showed that Brown called Samantha Dixon, who then announced that Brown just called and that it was "time to wrap things up and close down." With Brown's call to Dixon, the absentee ballot review process prematurely ended with numerous ballots left unexamined. Unwilling to yield his authority, Brown stated to a federal observer that "I don't

12

care what the court says. I am still primarily responsible for running this election." Second, poll managers failed to properly count absentee ballots and to address absentee-ballot challenges during the ballot counting. The MISSISSIPPI POLL MANAGER GUIDE contains, inter alia, a list of the steps to be followed when counting absentee ballots,[9] but the evidence indicates such guidance was ignored. Catherine Johnson, a poll manager at the Earl Nash precinct, was trained to believe she possessed the ultimate decisionmaking authority—or veto power—for all absentee-ballot challenges; she was heard stating that "I don't care what the poll managers vote, I don't care what their vote is. I'm going to veto it and we'll count the ballot." At this news, the poll managers who had earlier sustained a number of challenges no longer considered challenges. At the Macon Fire House precinct, a federal observer noted that Stowers, a poll manager, ordered the absentee-ballot counting closed before any of the ballots were examined for irregularities. Similarly, no challenges were entertained at the Shuqualak precinct because candidates and their representatives were not permitted to sit close enough to challenge the ballots. And third, federal observers recorded numerous instances of improper voter assistance that poll managers permitted. At the Macon Fire House, federal observers reported that fifteen black individuals, who refused to identify themselves, remained immediately outside the polling place and proceeded to escort many black voters directly into the voting booth where they told the voter for whom to vote. Federal observers tallied as many as 180 instances of such assistance despite efforts by poll manager Stowers to interfere with the observers' duties.

---

[9] For example, the GUIDE instructs poll managers, among other things, to "[a]nnounce the name, address, and precinct as shown on each absentee ballot envelope"; to "make sure the affidavit . . . on the envelope and the application is sufficient"; and to "[g]ive anyone present the opportunity to challenge any absentee ballot." MISS. SEC'Y STATE, MISSISSIPPI POLL MANAGER GUIDE 28 (2008), available at http://www.sos.state.ms.us/elections/ Mississippi%20TSX%20Poll%20Managers%20Guide.pdf.

13

Having heard the above evidence, the district court issued its remedial order on August 27, 2007. See United States v. Brown, No. 4:05-CV-33TSL-LRA, 2007 WL 2461965 (S.D. Miss. Aug. 27, 2007). In it, the court appointed a Referee-Administrator to organize the county's Democratic primary elections and to serve until November 20, 2011; limited the role that defendants may play in supervising future primary elections; and directed poll managers to apply Mississippi's election laws in counting ballots and preventing improper voter assistance.

Defendants now appeal both the court's finding of liability and order remedying § 2's violation.

## II. DISCUSSION

### A. The Liability Holding

#### 1. Standard Of Review

We review a finding of intentional discrimination in a § 2 vote dilution case for clear error under Rule 52 of the Federal Rules of Civil Procedure. See Thornburg v. Gingles, 478 U.S. 30, 79 (1986) (applying Rule 52 and stating "[t]he fact that amended § 2 and its legislative history provide legal standards which a court must apply to the facts in order to determine whether § 2 has been violated does not alter the standard of review"); Velasquez v. City of Abilene, 725 F.2d 1017, 1021 (5th Cir. 1984) ("The clearly erroneous standard is applicable in . . . statutory voting dilution cases."); see also Sensley v. Albritton, 385 F.3d 591, 595 (5th Cir. 2004) ("[W]e review the district court's . . . ultimate findings on vote dilution for clear error."). This standard dictates that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573–74 (1985); see

14

also FED. R. CIV. P. 52(a)(6) (stating that a reviewing court "must give due regard to the trial court's opportunity to judge the witnesses' credibility").

## 2. Section 2's Standards

Section 2 of the Voting Rights Act prohibits a state or political subdivision from employing any "standard, practice, or procedure . . . in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). The statute is violated if "under the totality of the circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of a class of citizens." Id. § 1973(b). Episodic practices, such as one-sided absentee-ballot counting, constitute a "practice" under § 2. See Welch v. McKenzie, 765 F.2d 1311, 1315 (5th Cir. 1985) ("[T]he statute covers episodic practices, as well as structural barriers, that result in discrimination in voting."); Goodloe v. Madison County Bd. of Election Comm'rs, 610 F. Supp. 240, 243 (S.D. Miss. 1985) ("Section 2 on its face is broad enough to cover practices which are not permanent structures of the electoral system but nevertheless operate to dilute or diminish the vote of [minorities]."); see, e.g., Toney v. White, 488 F.2d 310, 311–12 (5th Cir. 1973) (affirming that a violation of § 2 occurred when white voters were not purged from absentee voter rolls in conjunction with the zealous purging of the black voter rolls); Brown v. Post, 279 F. Supp. 60, 64–65 (W.D. La. 1968) (holding that defendant electoral officials violated § 2 by soliciting absentee ballots from white voters without making the same opportunity available to black voters). To violate the statute, however, these practices must be undertaken with an intent to discriminate or must produce discriminatory results. See McMillan v. Escambia County, 748 F.2d 1037, 1046 (Former 5th Cir. 1984) ("Moreover, Congress intended that fulfilling either the more restrictive intent test or the results test would be sufficient to show a violation of section 2."); S. REP. NO. 97-417, at 27 (1982) (accompanying the 1982

15

amendments to the Voting Rights Act and stating that "[p]laintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice . . . results in minorities being denied equal access to the political process"); see also Seastrunk v. Burns, 772 F.2d 143, 149 n.15 (5th Cir. 1985) ("Likewise, discriminatory intent of itself will normally render a plan illegal.").

Under the intent-based approach, "[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act" for a violation to occur. Velasquez, 725 F.2d at 1022. To find discriminatory intent, "'direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions'" may be considered. McMillan, 748 F.2d at 1047 (quoting S. REP. NO. 97-417, at 27 n.108). The factors set forth in Senate Report No. 97-417, oftentimes referred to as the "Zimmer factors," supply a source of circumstantial evidence regarding discriminatory intent.[10] See McCarty v. Henson, 749 F.2d 1134, 1136 (5th Cir. 1984) ("[T]he existence of the Zimmer factors might be indicative, though not conclusive, of discriminatory purpose."). Additional circumstantial evidence of discriminatory intent may include the impact of an action "bear[ing] more heavily on one race than another," "the historical background of the decision," the "specific sequence of events leading up to the challenged decision," "[d]epartures from the normal

---

[10] These factors include in pertinent part:

b. the extent to which voting in the elections of the state or political subdivision is racially polarized;

\*      \*      \*

f. whether political campaigns have been characterized by overt or subtle racial appeals;

\*      \*      \*

i. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Magnolia Bar Ass'n v. Lee, 994 F.2d 1143, 1147 (5th Cir. 1993) (citing S. REP. NO. 97-417, at 28–29).

procedural sequence," and "statements by members of the decisionmaking body." See Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266–68 (1977) (internal quotation marks omitted).

### 3. The District Court Did Not Clearly Err

Considering the above standards, we find no clear error in the district court's conclusion. The district court held that defendants "administered and manipulated the political process in ways specifically intended and designed to impair and impede participation of white voters and to dilute their votes." Brown, 494 F. Supp. 2d at 485. Defendants' chief argument invites this court to reconsider the district court's findings individually and contends that these findings constitute clear error; however, the record amply supports the district court's findings and demonstrates that defendants engaged in a series of episodic practices—in obtaining a large number of black absentee ballots, in preventing the proper challenges to absentee ballots, and in permitting numerous instances of improper voter assistance—that diluted the votes of white Democrats. Additionally, the court was permitted to infer that this conduct was undertaken with discriminatory intent: Brown's statements indicate that he was primarily motivated by race;[11] Brown's promise to challenge only white Democrats illuminated his racial motivation; defendants' departure from the state party's normal practice of hiring poll managers in proportion to the racial makeup of the local political subdivision suggests racial underpinnings; the tenuousness of defendants' conduct reflects that no other, legitimate purpose explains defendants' obtaining large numbers of defective absentee ballots and preventing the proper screening of such ballots; and the racial polarization of elections in Noxubee County indicates that the goal of placing more black candidates in elected positions may be accomplished by obtaining additional black votes and

---

[11] We reiterate that Brown's statements are not, in themselves, at odds with § 2. His statements, however, bear on the nature of his intent in performing the conduct at issue here.

17

invalidating white votes. The sum of these facts supports the district court's finding. Thus, the district court did not clearly err in concluding that defendants violated § 2 by abusing their authority over the election process—the absentee-ballot process, in particular—in order to intentionally dilute white voting power.

In addition to questioning the district court's findings, defendants challenge the court's credibility determinations and come dangerously close to suggesting, without support, that the court's decision to credit the testimony of the government's witnesses over that of the defendants' was racially motivated. But other than complain of this credibility determination, defendants fail to point to any contradictory evidence or internal inconsistency in the district court's finding. See Anderson, 470 U.S. at 575 ("[F]indings [that] are based on determinations regarding the credibility of witnesses . . . demand[] even greater deference. . . . [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses . . . that finding, if not internally inconsistent, can virtually never be clear error."). We find no such evidence or inconsistency and decline to reverse the district court's decision in this regard.

Next, defendants incorrectly claim that the district court's findings impermissibly burden them with demonstrating they did not violate § 2. This argument misconstrues the district court's actual considerations here. It is true that the government, as the plaintiff, bears the initial burden of proving that § 2 has been violated. See Voinovich v. Quilter, 507 U.S. 146, 155 (1993) ("Section 2 . . . places at least the initial burden of proving [a challenged practice's] invalidity squarely on the plaintiff's shoulders."). Once the government has presented its evidence, however, the court may draw reasonable inferences from this evidence unless defendants explain these inferences away. See United States v. Chagra, 669 F.2d 241, 258 (5th Cir. 1982) ("The possibility that the evidence in a particular case may be sufficiently persuasive to convince [the factfinder] to draw [one] inference rather than another unless the defendant

18

offers an alternative explanation does not constitute a shift in the burden of persuasion . . . ."), overruled on other grounds by Garrett v. United States, 471 U.S. 773 (1985). Here, the court was permitted to draw the inference of defendants' intentional dilution of white votes from the government's evidence, and the defendants' evidence failed to persuade the court otherwise.

Finally, we recognize that the Voting Rights Act does not "guarantee minority success at the polls," but it does require that "minorities not have 'less opportunity than other[s] . . . to participate in the political processes and to elect representatives of their choice.'" Seastrunk, 772 F.2d at 154 (alteration and omission in original, emphasis removed) (quoting 42 U.S.C. § 1973(b)). Defendants, through abusing their supervisory role over the absentee-ballot process, have denied white Democrats the opportunity to elect representatives of their choice. Nonetheless, they urge this court to stay its hand and "let things evolve" in Noxubee County because they pursued what they view as an honorable goal of electing black candidates. To do so, however, defendants have wielded their authority over the election process to violate Mississippi's election laws at the expense of Mississippi voters. To champion the cause of black candidates by abusing the supervisory authority over elections in order to undermine the value of white voters' ballots breaches the boundary between acceptable political activity and unacceptable electoral abuse.

Having found no clear error in the district court's conclusion, we next consider the court's remedy.

B. The Remedial Order

1. Standard Of Review

The district court's relief is reviewed for an abuse of discretion. See E. Carroll Parish Sch. Bd. v. Marshall, 424 U.S. 636, 639–40 (1976) (reviewing the district court's remedial relief for abuse of discretion); Rodriguez v. Bexar County, 385 F.3d 853, 870 (5th Cir. 2004) (holding that a district court's remedial

19

relief following violation of § 2 was an abuse of discretion); Harper v. City of Chi. Heights, 223 F.3d 593, 601 (7th Cir. 2000).

## 2. Remedial Order Considerations

When devising a remedy to a § 2 violation, the district court's "first and foremost obligation . . . is to correct the Section 2 violation." Bone Shirt v. Hazeltine, 461 F.3d 1011, 1022 (8th Cir. 2006). In doing so, the district court "should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength." S. REP. NO. 97-417, at 31; see also United States v. Dallas County Comm'n, 850 F.2d 1433, 1438 (11th Cir. 1988). Though we review the court's remedy for abuse of discretion, this discretion is not without limit. For example, voiding entire elections is a drastic remedy requiring sufficient need, see, e.g., Rodriguez, 385 F.3d at 859 n.2 ("Setting aside an election is a drastic remedy."), and, at least in redistricting cases, district courts must offer governing bodies the first pass at devising a remedy, see, e.g., Bone Shirt, 461 F.3d at 1022 ("As required, the defendants were afforded the first opportunity to submit a remedial plan."); Rodriguez, 385 F.3d at 870 ("[T]his court ha[s] admonished district courts to afford local governments a reasonable opportunity to propose a constitutionally permissible plan . . . ."); Jones v. City of Lubbock, 727 F.2d 364, 387 (5th Cir. 1984) ("A district court should . . . afford to the government body a reasonable opportunity to produce a constitutionally permissible plan."). This guidance demonstrates that the district court's order should be sufficiently tailored to the circumstances giving rise to the § 2 violation. We now consider defendants' challenges to the court's remedial order.[12]

---

[12] The government asserts that defendants failed to object to the order's provisions below and that, therefore, defendants have not preserved these arguments. We disagree. There is "[n]o bright-line rule . . . for determining whether a matter was raised below." Castillo v. Cameron County, 238 F.3d 339, 355 n.21 (5th Cir. 2001) (internal quotation marks omitted). In their filings prior to the district court's order, defendants argued that their voluntary

### 3.    The District Court Did Not Abuse Its Discretion

In light of the record detailing the events of the August 2007 primary election, we cannot say that the court abused its discretion in fashioning the remedial order. Before issuing the order, the district court considered proposed remedies from both parties and permitted defendants to supervise the upcoming primary election. Despite their representations to the court and despite the court's prior liability holding, defendants recidivated. In so doing, defendants demonstrated that they could not be relied upon to voluntarily remedy their § 2 violation. Correspondingly, the district court tailored the terms of its order "to prevent a recurrence of past transgressions." Brown, 2007 WL 2461965 at *1 n.1.

The district court held two evidentiary hearings before determining the appropriate remedy. At the first hearing, the court considered whether to enjoin and delay the upcoming August 2007 primary election. Upon the defendants' indication that Brown would not participate in the absentee-ballot process, that absentee ballots would be properly counted, that candidates would be permitted to challenge absentee ballots, and that improper assistance would be prevented, the parties agreed that the primary election would occur as planned. At the second hearing, the district court heard testimony concerning the events of that election: Brown remained involved in handling and distributing the absentee ballots to the polls; Brown contacted two poll managers by phone, resulting in one manager prematurely concluding the ballot-counting process and leaving absentee ballots unexamined; absentee ballots were not counted according to the proper procedure, which is outlined in the Mississippi Poll Manager Guide that defendants indicated would be used to train poll managers; candidates were

---

undertakings were sufficient to remedy the § 2 violations; that, at most, an observer should be appointed to oversee the elections, permitting defendants to continue administering primary elections; and that defendants' presence at the polls and the Circuit Clerk's office should not be limited. Thus, we consider defendants' claims on appeal.

prevented from challenging absentee ballots; and individuals were permitted to provide unsolicited assistance to black voters. For their part, defendants do not attempt to explain or excuse their conduct during the 2007 primary election in their brief to this court.

Though it is apparent that defendants' own conduct has rendered the remedial order's terms necessary to right the § 2 violation, defendants now challenge select provisions of the order. In so doing, defendants repeatedly urge that federal observers would constitute a sufficient remedy and argue that the district court failed to explain why such observers would be ineffective. The simple answer, of course, is that the presence of federal observers did nothing to dissuade defendants from engaging in the same conduct found to have violated § 2. Additionally, defendants' own authority for their proposition that observers alone are sufficient, United States v. Berks County, 277 F. Supp. 2d 570 (E.D. Pa. 2003), supports the contrary conclusion—that a remedy must be tailored to address the circumstances of the § 2 violation. In Berks County, § 2 was violated when election officials permitted hostility toward Spanish-speaking voters, Spanish-speaking voters were not equally assisted, Spanish-speaking individuals were underrepresented in the corps of poll workers, and Spanish-language election materials were not provided. Id. at 580–81. To remedy the violation, the court ordered that Spanish-speaking voters be ensured access to assistance, that a proportionate amount of Spanish-speaking poll workers be appointed, that Spanish-language voting materials be provided, and that federal observers be appointed. Id. at 583–85. In like manner, the court's remedial order here is tailored to defendants' specific conduct that violated § 2. With that, we now turn to defendants' remaining arguments.

First, defendants assert that the authority granted to the Referee-Administrator—"all electoral duties . . . shall be executed by the Referee-Administrator," Brown, 2007 WL 2461965 at *1—is too broad and deprives them

22

of their First Amendment rights to free expression and association. Defendants, however, fail to explain how delegating these duties to the Referee-Administrator interferes with such rights. Defendants may still carry on in their capacity as the local leaders of the Democratic party by, for example, raising funds, endorsing candidates, campaigning for candidates, organizing party meetings, and speaking out on political issues. "[E]lectoral duties," conversely, consist of the mechanics of administering a primary election: "certification of candidates, appointment of poll officials, assignment of poll officials to the various voting precincts, distribution of regular ballots and ballot boxes containing absentee ballots, supervision of polling locations and poll officials, and certification of election results." See Brown, 2007 WL 2461965 at *1; see also MISS. CODE ANN. § 23-15-263(1) (listing the county executive committee's duties in a primary election); cf. MISS. SEC'Y STATE, COUNTY ELECTION HANDBOOK App. D at 38 (2007) (listing the nearly identical responsibilities of a county election commission in a general election), available at http://www.sos.state.ms.us/elections/2007%20County%20Election%20Handbook2.pdf. Contrary to defendants' assertion, the court's order does not attempt to regulate the leadership of the local Democratic party. Thus, defendants' reliance on California Democratic Party v. Jones, 530 U.S. 567 (2000), and Eu v. San Francisco County Democratic Central Committee, 489 U.S. 214 (1989), is misplaced. Both those cases involved challenges to California statutes either that permitted unaffiliated voters to participate in choosing the party's actual leadership, see Jones, 530 U.S. at 581 (determining that California's "blanket" primary system violated voters' associational freedom because the process "open[ed] [the leadership-selection process] up to persons wholly unaffiliated with the party"), or that specified from where the state party's chairperson must come and how long she may serve, see Eu, 489 U.S. at 218 (affirming the invalidation of provisions of California's Elections Code that "fix[ed] the

23

maximum term of office for the chair of the state central committee . . . [and] require[d] that the chair rotate between residents of northern and southern California").

Defendants next complain of the order's restricting Brown's ability to communicate with poll workers, limiting Brown's presence at the polling places and Circuit Clerk's office, and barring defendants from interfering with the Referee-Administrator. As the facts of the August 2007 primary show, however, the court specifically limited Brown's involvement because of Brown's demonstrated inability to refrain from interfering with the legitimate mechanics of the county's primary elections. The district court's order bars Brown from "giv[ing] any written or oral instructions or mak[ing] any suggestions to poll officials regarding their duties as poll officials" and bars poll managers while they "are reviewing absentee ballots . . . from contacting or receiving communication from defendant Brown . . . at any time regarding the review of the absentee ballots." Brown, 2007 WL 2461965 at *2, *4. In their freedom of expression and association arguments, defendants do not describe how this order prevents Brown from expressing his political views to poll managers. Instead, Brown is only enjoined from communicating with poll managers regarding their electoral duties and the counting of ballots. The facts of the 2003 and 2007 elections make plain the need for these limitations; in both instances, Brown's statements, whether spoken or scribbled on post-it notes, resulted in poll managers improperly terminating the counting of absentee ballots and selectively rejecting absentee ballots. Similarly necessary based on Brown's conduct is the order's restricting Brown's presence at the polling place "unless he is voting, has been appointed as a poll watcher for a candidate, or the Referee-Administrator has appointed him to work as a poll official" and at the Circuit Clerk's office "two weeks prior to any primary election except for matters pertaining solely to him or his immediate family." See id. at *4. In the 2003

24

primary and general elections, Brown directly ordered poll managers in a polling place to count all the absentee ballots when those ballots had not yet been reviewed, and Brown abused his access to the Circuit Clerk's office to monitor and carry out his absentee-ballot distribution scheme. Again, insofar as defendants assert that these provisions restrict their freedom of expression, they fail to explain what expressive conduct Brown will engage in at the Circuit Clerk's office or within the polling places at the specifically restricted times. Defendants, however, do explain that the order's pronouncement that "defendants shall not interfere or attempt to interfere in any way with the responsibilities of the Referee-Administrator," see id. at *2, prevents them from speaking to anyone about the responsibilities of the Referee-Administrator, but the clear language of the order does not bear defendants' broad reading.

We are equally unpersuaded by defendants' contention that the remedial order's delegating "all electoral duties" and directing that Mississippi's electioneering laws be enforced "equally" are impermissibly vague. "'The mere fact that . . . interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him.'" Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co., 195 F.3d 765, 771 (5th Cir. 1999) (quoting United States v. Greyhound Corp., 508 F.2d 529, 536 (7th Cir. 1974)). Little interpretation is necessary to understand what it means to enforce laws equally, and we have earlier explained that the electoral duties delegated to the Referee-Administrator involve those duties in organizing the mechanics of election-day activities.

Defendants' final argument likewise lacks merit. They assert that shackling them with these restrictions while not similarly doing so to the county's Republican executive committee violates their right to equal protection of the laws. But, as the government points out, the Republican executive committee, unlike defendants, has not been found to have violated § 2.

25

Considering the above, we are convinced that the district court did not abuse its discretion.

## III. CONCLUSION

For the aforementioned reasons, we AFFIRM the district court's order entered June 29, 2007 and its order entered August 27, 2007.